981 F.2d 1398
 61 USLW 2406
 UNITED STATES of America
v.
Michael E. KATORA, Daniel A. Squire,
Daniel A. Squire, Appellant in No. 91-3505.
UNITED STATES of America
v.
Michael E. KATORA, III, Daniel A. Squire,
Michael E. Katora, III, Appellant in No. 91-3519.
UNITED STATES of America
v.
Michael E. KATORA, III, Daniel A. Squire,
Michael E. Katora, III, Appellant in No. 91-3575.
 Nos. 91-3505, 91-3519 and 91-3575.
 United States Court of Appeals,
Third Circuit.
 Argued July 29, 1992.
Decided Dec. 7, 1992.
 
 Thomas S. White, Federal Public Defender, Rita C. Murillo (argued), Asst. Federal Public Defender, Pittsburgh, PA, for appellant Daniel A. Squire.
 Frederick W. Thieman (argued), Hilner, Thieman & Fraas, Pittsburgh, PA, for appellant Michael E. Katora, III.
 Thomas W. Corbett, Jr., U.S. Atty., Paul J. Brysh (argued), Asst. U.S. Atty., Pittsburgh, PA, for appellee.
 Before: BECKER, MANSMANN and NYGAARD, Circuit Judges.
 OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 Michael E. Katora and Daniel A. Squire appeal from judgments in a criminal case after a jury convicted them of wire fraud and other related interstate offenses. We are called upon to decide whether subsection 3B1.1(c) of the United States Sentencing Guidelines, which increases a person's offense level for his role as an organizer, can apply when the only participants in an offense have shared equal responsibility. We are also called upon to determine whether the district court followed the correct legal standard in calculating the amount of loss resulting from the fraud. Because we conclude that subsection 3B1.1(c) does not apply unless a defendant has organized, led, managed or supervised another participant, (i.e., another legally culpable person), we will remand the case for resentencing.
 
 
 2
 After full consideration, we have concluded that the other arguments advanced by Katora and Squire are without merit.[1] We will therefore confine our discussion to the applicability of subsection 3B1.1(c) and to the calculation of loss.I.
 
 
 3
 In essence, Katora and Squire telephoned their own phone service thousands of times so as to create the illusion that the service had large, bona fide accounts receivable, and then they sold those illusory accounts.
 
 
 4
 First, Katora and Squire, as officers of a corporation called Jobs 900, contracted with MCI to obtain several 900-prefix telephone numbers. The 900-prefix telephone service would allow Jobs 900, as a subscriber, to provide information to callers for a fee. MCI would collect the fee from the caller, subtract service charges, then forward the balance to the subscriber (Jobs 900).
 
 
 5
 In the same office as Jobs 900, Katora and Squire connected automatic dialing equipment to four telephone lines. Renaissance Marketing, a company that Squire controlled, subscribed to regular MCI long-distance service on these four lines. Although Renaissance Marketing and Jobs 900 shared an office, Squire gave a different billing address for Renaissance Marketing.
 
 
 6
 Meanwhile, Katora and Squire negotiated a contract with James Janota of Commercial Factors. A factor is a firm that buys accounts receivable at a discount.[2] As part of Janota's due diligence, he visited the Jobs 900 office where he observed equipment, a receptionist, and other employees. Janota, Katora, Squire and Katora's attorney then reviewed the contract, line by line.
 
 
 7
 In the contract, Katora and Squire gave personal guarantees and warranted that:
 
 
 8
 16. Each account offered for sale to FACTOR is an accurate statement of a bona fide sale, delivery and acceptance of merchandise or performance of service by CLIENT to customer.
 
 
 9
 17. CLIENT does not own, control or exercise dominion over, in any way whatsoever, the business of any account/customer to be factored by CLIENT to FACTOR.
 
 
 10
 R. at 866-69. The contract also set a $250,000 limit, subject to increase at Commercial Factors' discretion. After reviewing the contract, Katora's attorney warned him in a letter that paragraph 16 "could pose some problems for you." He also addressed Katora's personal guarantee and whether a bankruptcy creditor could reach Katora's personal income, which consists of tax-free disability pay.
 
 
 11
 On October 2, 1990, Katora and Squire began using the automatic dialer to call one of the 900-prefix numbers. MCI would bill Renaissance Marketing for the calls. Except for MCI's service charges, the amount due from Renaissance Marketing (Squire's company) would become an account receivable for Jobs 900 (Katora's and Squire's company). Each call was the equivalent of an I.O.U., written on MCI stationery, from Renaissance Marketing to Jobs 900.
 
 
 12
 In the first seven days, Renaissance Marketing's bill totalled over $200,000, and correspondingly, Jobs 900 had accounts receivable for almost the same amount (after MCI's service charges). Katora and Squire then raised rates on some of the other 900-prefix numbers. They eventually made some 350,000 calls, worth about $3.6 million. Most of the $3.6 million would appear to be bona fide accounts receivable for Jobs 900; MCI's service charges on the calls totalled less than $130,000.
 
 
 13
 On October 22, Katora and Squire gave Janota an MCI report showing receivables due from some of Renaissance Marketing's calls to Jobs 900. They did not tell Janota that they controlled Renaissance Marketing. Nor did they tell Janota that they had made the calls themselves.
 
 
 14
 Katora did tell Janota that MCI had approved the factoring arrangement in writing, even though MCI had not. At first, Katora claimed that MCI's signature on the approval did not come through on a fax. Finally, Katora produced a faxed acknowledgement from MCI that it had received the approval agreement for purposes of review. Janota faxed the acknowledgment to his supervisor, who authorized him to send a $123,390 check by Federal Express. FBI agents picked up the check at the Federal Express Office and delivered it to Jobs 900.
 
 
 15
 During a jury trial, Katora and Squire asserted that they made the 350,000 phone calls to test MCI's ability to generate billing information. They also asserted that they intended to pay MCI with the check from Commercial Factors and to pay Commercial Factors with Katora's own funds, if necessary. Despite these assertions, the jury convicted each defendant of five counts of wire fraud in violation of 18 U.S.C. § 1343, and four counts of related acts in violation of 18 U.S.C. § 2314 (interstate travel in connection with, and transportation of, a fraudulently obtained check) and 18 U.S.C. § 371 (conspiracy).
 
 
 16
 In calculating the offense level for both Katora and Squire, the district court began with a base level of 6 pursuant to subsection 2F1.1(a) of the United States Sentencing Guidelines. The district court increased the base offense level by 2 because the offense required more than minimal planning, see U.S.S.G. § 2F1.1(b)(2)(A), and again by 2 for their roles as organizers, see U.S.S.G. § 3B1.1(c).
 
 
 17
 In support of its conclusion that both were organizers, the district court found that "Katora both conceptualized and created Jobs 900 and shared much if not most of the final decision making authority that led to the implementation of the fraud...." (R. at 2298.) The district court also concluded that "Squire shared most of the final decision making authority that lead to the creation and implementation of the fraud.... His role in organizing and staffing [Renaissance Marketing], along with his numerous directives to MCI and Commercial Factors representatives, highlight his role in the offense as an organizer, leader and manager." (R. at 2229.)
 
 
 18
 With respect to the amount of loss, the presentence reports had set the amount of loss at $3,615,838, the total bill generated by Renaissance Marketing's calls. The district court rejected that calculation, recognizing that the $3.6 million figure overstated the amount of loss. (R. at 2306.) Instead, the district court found that the actual or intended loss was $373,600, an amount slightly less than the sum of MCI's loss ($126,190) plus the factor's self-imposed limit ($250,000). The court thus increased the offense level by 9 under subsection 2F1.1(b)(1)(J) for an offense resulting in loss between $350,000 and $500,000.
 
 
 19
 The court thus set each defendant's offense level at 19. The resulting sentence range for each was 30-37 months. Consistent with its view that neither defendant was more culpable than the other, the district court sentenced each defendant to the identical term of imprisonment, 34 months.
 
 
 20
 Katora and Squire offer two challenges to their sentences. First, they argue that the district court should not have applied subsection 3B1.1(c) of the sentencing guidelines to them. Second, they argue that the district court calculated loss (pursuant to U.S.S.G. § 2F1.1(b)) under the wrong legal standard. We address each of these challenges in turn.
 
 II.
 
 21
 We have jurisdiction of these appeals from judgments in a criminal case. 18 U.S.C. § 3742(a); 28 U.S.C. § 1291. The district court had subject matter jurisdiction of the prosecution pursuant to 18 U.S.C. § 3231.
 
 
 22
 We "exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application." United States v. Inigo, 925 F.2d 641, 658 (3d Cir.1991).III.
 
 A.
 
 23
 Part 3B1 of the guidelines directs a sentencing court to adjust a defendant's offense level based on his role in the offense. See U.S.S.G. Part 3B1, Introductory Commentary. Section 3B1.2 directs the court to decrease the offense level for a minor role. Pursuant to section 3B1.1, the section involved here, the court may increase the offense level for an aggravating role. It provides:
 
 
 24
 § 3B1.1 Aggravating Role
 
 
 25
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 26
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 27
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 28
 (c) If the defendant was an organizer, leader, manager or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 29
 U.S.S.G. § 3B1.1.
 
 
 30
 Having concluded that each of the two defendants was an organizer, leader and manager, the district court applied subsection 3B1.1(c) to enhance their offense levels. The court based its conclusion on findings that each shared in the "final decision making authority" in the creation and implementation of the fraud, and that Squire had staffed the office with outsiders. The court also found that the fraud involved fewer than five participants and was not otherwise extensive; accordingly, the court did not apply subsection 3B1.1(a) or (b).
 
 
 31
 Katora and Squire challenge the district court's interpretation and application of section 3B1.1. We therefore exercise plenary review. See Inigo, 925 F.2d at 658.
 
 B.
 
 32
 The Introductory Commentary to Part 3B1 of the guidelines informs that section 3B1.1 or 3B1.2 (or neither) may apply when an offense is committed by more than one "participant," which means more than one "person who is criminally responsible for the commission of the offense, but need not have been convicted." See U.S.S.G. Part 3B, Introductory Commentary; U.S.S.G. § 3B1.1, Application Note 1 (defining "participant"). Accordingly, we have ruled that sections 3B1.1 and 3B1.2 do not apply to solitary offenders. See United States v. Badaracco, 954 F.2d 928, 934 (3d Cir.1992); United States v. Bierley, 922 F.2d 1061, 1065 (3d Cir.1990). For example, in Badaracco, we held that the sentencing court should not have enhanced the offense level under subsection 3B1.1(c) if the offender had acted alone; in Bierley, we held that a solo offender who purchased child pornography from a postal inspector could not receive a downward adjustment under section 3B1.2.
 
 
 33
 The government argues that section 3B1.1 applies here because more than one participant committed the offense. The application of section 3B1.1, however, requires more than the existence of multiple participants. To apply section 3B1.1, a district court must find that the defendant exercised control over at least one other person. United States v. Fuentes, 954 F.2d 151, 153 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992). In Fuentes, for example, a defendant who managed a crack house, but not people, could not receive an enhancement under subsection 3B1.1(b). Fuentes, 954 F.2d at 153-54.
 
 
 34
 The district court's findings that Katora and Squire shared responsibility for creating and carrying out the fraud do not indicate that either Katora or Squire organized the other. Rather, the district court's findings indicate that Katora and Squire were "organizers" only in the sense that they were "planners" of the offense. Just as section 3B1.1 cannot enhance the sentence of a solo offender, see, e.g., Badaracco, 954 F.2d at 934, neither can it enhance the sentences of a duo when they bear equal responsibility for "organizing" their own commission of a crime. We note that to the extent the district court's findings indicate "organization" in the sense of planning, each defendant received a 2-level increase under 2F1.1(b)(2)(A) for more than minimal planning.
 
 
 35
 Because the district court found that neither Katora nor Squire directed the other, application of section 3B1.1 would only be appropriate if Katora and Squire had organized a third person. Here, the government did not identify--in its briefs or at oral argument--any third (culpable) participant whom Katora and Squire might have organized. Rather, the government has argued that the defendants' sentences are subject to enhancement under section 3B1.1 because the defendants organized the non-culpable office staff, who were outsiders to the fraud.
 
 
 36
 Although the language of section 3B1.1 is not entirely clear, our precedent, when informed by the guidelines' policy of reducing disparity in sentences, see S.Rep. No. 225, 98th Cong., 2d Sess. 39, reprinted in 1984 U.S.C.C.A.N. 3182, 3183, 3222, dictates that management of a non-culpable party does not warrant application of section 3B1.1.
 
 
 37
 As a starting point, we note that it is impossible to reconcile the section's threshold requirement of more than one participant--a requirement imposed by the Introductory Commentary and by precedent--with a definition of management that encompasses non-participants. Such a definition would create an unprincipled disparity between, on the one hand, the sentence of a solo defendant who manages an outsider but who cannot receive the enhancement because of the threshold requirement, and, on the other hand, the sentence of a defendant who manages an outsider but who happens to have a co-participant.
 
 
 38
 In Badaracco, we held that a solo offender who had involved non-culpable developers in bank fraud could not receive an enhancement under section 3B1.1(c). 954 F.2d at 934-35. Here, as in Badaracco, we are faced with outsiders to the crime who are essentially victims; one employee worked for eight weeks but never received his wage (R. at 665), the other received a check that bounced (R. at 745). It would contradict the guidelines' policy of reducing sentencing disparity to exempt a solo offender like Badaracco who managed outsiders but to penalize Katora and Squire for the same conduct simply because they reach the threshold requirement of "more than one participant."[3] If the section were meant to apply to the management of outsiders, then the threshold requirement of "more than one participant" would not exist. The existence of a second, "equally culpable" participant does not provide a principled distinction between the two outcomes.[4]
 
 
 39
 Our holding in Fuentes also informs our holding here, for in Fuentes we held, even in a crime that involved more than one participant, that the management of property could not trigger application of subsection 3B1.1(c). 954 F.2d at 153-54. It would surely create disparate sentencing treatment to exempt the superintendent of a crack house while penalizing the supervisor of a non-culpable employee.[5]
 
 
 40
 Similarly, based on Fuentes, the government's alternate theory--that the use of different corporate forms warrants application of subsection 3B1.1(c)--must fail. If "management" does not apply to real property, Fuentes, 954 F.2d at 154, then it cannot apply to intangible corporate entities.
 
 
 41
 The language of section 3B1.1 and of its commentary supports our holding here. The title and first clause of section 3B1.1 indicate that the defendant's "role in the offense" is the central criterion for application[6]; size, or "extensiveness," of the activity is secondary.[7] The application notes only authorize use of non-culpable "outsiders" to calculate "extensiveness," not to determine "role."[8] To be sure, once a court has determined that a defendant's role among other participants dictates application of 3B1.1, the severity of the enhancement increases as a function of both relative culpability and extensiveness of the crime. See U.S.S.G. § 3B1.1, Background; compare § 3B1.1(a)-(b) (increasing severity for extensive activity) with § 3B1.1(c) (enhancing sentence for leadership role in non-extensive offense); compare § 3B1.1(a) (imposing a severe enhancement for leadership) with § 3B1.1(b) (imposing an intermediate enhancement for management). There is no indication in the commentary or in the section itself, however, that outsiders may be used to determine a defendant's role in the offense, especially given that outsiders can never be used to determine a solo offender's "role in the offense."
 
 
 42
 Thus, a common sense reading of sections 3B1.1 and 3B1.2, together with the commentary and caselaw, demonstrates that these two sections are meant to adjust for a defendant's responsibility in criminal activity relative to other participants. Moreover, the harm of manipulating outsiders could not possibly be the concern of a provision that would not apply to a solo offender who brings about that harm.[9] Indeed, in both Fuentes and Bierley we recognized that "adjustments authorized [by §§ 3B1.1 and 3B1.2] for role in the offense are directed to the relative culpability of participants in group conduct." Fuentes, 954 F.2d at 153; Bierley, 922 F.2d at 1065; see also United States v. Phillips, 959 F.2d 1187, 1191 (3d Cir.1992) (for § 3B1.1 to apply, defendant must have exercised some control over others involved in commission of offense); United States v. DeCicco, 899 F.2d 1531, 1535 (7th Cir.1990) (" § 3B1.1 to apply only to situations where the offender organizes or leads criminally responsible individuals"); United States v. Carroll, 893 F.2d 1502, 1509 (6th Cir.1990) (§ 3B1.1 requires at least two culpable individuals so that leadership, however minimal, can be claimed); Badaracco, 954 F.2d at 934 (citing DeCicco and Carroll ).[10]
 
 
 43
 In summary, we conclude that the application of sections 3B1.1 and 3B1.2 has two prerequisites: multiple participants and some differentiation in their relative culpabilities. Once these prerequisites are found to exist, a court will apply subsection 3B1.1(a) or (b) to enhance the more culpable participants' offense levels so long as there were five or more participants or so long as the criminal activity was "otherwise extensive." Alternatively, the court may apply subsection 3B1.1(c) if there were fewer than five participants and the criminal activity was not otherwise extensive.
 
 
 44
 Here, because the only two participants were equally culpable and, furthermore, because they did not organize, lead, manage or supervise a third participant, neither section 3B1.1 nor section 3B1.2 could apply. Therefore, we find that the district court committed an error of law in applying subsection 3B1.1(c) to the defendants.
 
 IV.
 
 45
 Subsection 2F1.1(b) directs a court to increase a defendant's offense level in proportion to the amount of loss caused by a fraudulent offense. U.S.S.G. § 2F1.1(b)(1)(A)-(S) (table). The application notes indicate, in various places, that "Loss" means the value of property taken, damaged, or destroyed; that the loss need not be determined with precision; that a court should consider whether actual loss overstates or understates the seriousness of the defendant's conduct; and that the offender's gain will usually underestimate the loss. See U.S.S.G. § 2B1.1, Application Note 2; § 2F1.1 Application Notes 7-8; § 2X1.1, Application Note 4. See generally United States v. Kopp, 951 F.2d 521, 526-536 (3d Cir.1991) (discussing calculation of loss in fraud cases).
 
 In Kopp, we held:
 
 46
 [F]raud "loss" is, in the first instance, the amount of money the victim has actually lost (estimated at the time of sentencing), not the potential loss as measured at the time of the crime. However, the "loss" should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss.
 
 
 47
 951 F.2d at 536.
 
 
 48
 The district court found the loss to be $373,600--slightly less than the sum of the $250,000 factoring limit plus MCI's total unpaid service charges ($126,190.21). There was sufficient evidence for the district court to determine that Katora and Squire inflicted a loss of at least $123,000 on MCI, and there was sufficient evidence that Katora and Squire intended to inflict a loss of at least $250,000 on Commercial Factors. See United States v. Kikumura, 918 F.2d 1084, 1099 (3d Cir.1990) (preponderance standard). The MCI affidavit sufficiently proves MCI's loss of $126,190.21. An intended loss of at least $250,000 can be reasonably inferred from the following evidence. Katora and Squire generated over three million dollars in false accounts receivable. (R. at 631.)[11] Prior to that, they had attempted to negotiate a factoring arrangement of up to two million dollars. (R. at 860-66.) They settled for an agreement that limited the amount to be factored at $250,000, but the agreement also left open the possibility of an increase in the $250,000 limit at Commercial Factors' discretion. (R. at 860-66.) The only explanation Katora and Squire have offered for generating the calls is the incredible story that they were "testing" MCI. Thus the only logical inference is that Katora and Squire intended to exchange the receivables for cash from Commercial Factors, at least to the contractual limit of $250,000, and perhaps beyond that amount if Commercial Factors raised the limit. This inference is supported by Squire's own statement to Janota after their last meeting: "We will see you next week with additional business." (R. at 894.) Given the above facts and reasonable inferences, we cannot say it was clearly erroneous for the district court to find that Katora and Squire intended to inflict a loss of $250,000 on Commercial Factors.[12]
 
 
 49
 Katora and Squire premise a number of their challenges to this finding on their assertion that they intended to repay MCI and Commercial Factors. The district court, however, was not bound to believe them and obviously did not. Indeed, the government presented evidence that the money advanced from Commercial Factors was not going to MCI, but would be used to pay salaries, rent, insurance, and other bills. (R. at 2191-92 (government's argument at sentencing).) Thus, we cannot accept their argument that MCI's loss must be attributed to the FBI (for shutting down Jobs 900) rather than to themselves (for intent not to pay).
 
 
 50
 Similarly, we cannot accept their argument that their personal guarantees to repay Commercial Factors were somehow more reliable than their contractual warranties that they would sell bona fide receivables from unrelated customers. This situation thus differs from Kopp, 951 F.2d at 521, in which we required a district court to consider the value of a mortgage on real property used to fraudulently obtain a loan. Here, in contrast to an ascertainable market value on real property at issue in Kopp, the personal guarantees did not have a market value given Squire's inability to pay and Katora's inquiries into the protections of bankruptcy.
 
 
 51
 Finally, although Katora and Squire are correct in arguing that the $123,000 check represents a measurable loss that Commercial Factors would have actually suffered, there was evidence that Katora and Squire intended to return to Commercial Factors the next week for "more business" (R. at 894), that is, further intended loss. As we remarked above, the district court reasonably could have concluded that Katora and Squire intended to inflict losses on Commercial Factors up to the $250,000 limit. See Kopp, 951 F.2d at 536 (instructing courts to use higher of actual or intended loss).
 
 
 52
 In summary, the district court did not err as a matter of law or fact in finding that MCI and Commercial Factors were victims of a fraud and in calculating their "loss" under subsection 2F1.1(b)(1) to be the sum of the actual loss suffered by MCI and the loss intended by Katora and Squire for Commercial Factors.
 
 V.
 
 53
 For the foregoing reasons, we will remand the case to the district court for resentencing without a 2-level enhancement pursuant to subsection 3B1.1(c) of the United States Sentencing Guidelines. With respect to all other issues, we will affirm the judgments of the district court.
 
 
 54
 BECKER, Circuit Judge, concurring and dissenting.
 
 
 55
 I join in the opinion of the court except for Part III.B. With respect to that Part, I believe that the majority has misinterpreted § 3B1.1(c) of the Guidelines by requiring, as a threshold to its application, that the defendant have organized, led, managed, or supervised[1] a fellow participant, as opposed to an unwitting third party, in committing the offense.[2]
 
 I. Background
 
 56
 The district court increased both Katora's and Squire's base offense levels by 2 under U.S.S.G. § 3B1.1(c) based on their roles as organizers and supervisors. With regard to Katora, the district court found that "Katora both conceptualized and created Jobs 900 and shared much if not most of the final decision making authority that led to the implementation of the fraud perpetrated upon Commercial Factors and MCI by Jobs 900, R.M Inc., and Fourth Audio Cash." United States v. Katora, No. 90-217, Tentative Findings and Rulings at 9 (W.D.Pa. July 26, 1991). With regard to Squire, the court found:
 
 
 57
 Squire shared most of the final decision making authority that led to the creation and implementation of the fraud perpetrated upon Commercial Factors and MCI by Jobs 900, R.M Inc., and Fourth Audio. His role in organizing and staffing R.M. Inc. and Fourth Audio Cash, along with his numerous directives to MCI and Commercial Factors representatives, highlight his role in the offense as a organizer, leader and a manager.
 
 
 58
 United States v. Squire, No. 90-217, Tentative Findings and Rulings at 3 (W.D.Pa. July 26, 1991).
 
 
 59
 In comparing the relative roles of Katora and Squire, the district court noted that each ran, dominated, and organized corporations within the scheme.[3] The court concluded:
 
 
 60
 I agree that you could argue and could conclude properly that they are equally culpable based on the jury verdict; however, I think that [§ 3B1.1(c) ] is appropriate in this case. I think that each was an organizer, leader, manager or supervisor; certainly maybe not identically in the sense that they didn't do the same things, but that was the practical result.
 
 
 61
 Transcript of Katora's Sentencing Hearing at 10 (July 29, 1991).
 
 
 62
 The defendants argue on appeal that the district court misapplied § 3B1.1(c) in adjusting their sentences upward because they were found to be roughly equal participants and because § 3B1.1(c) applies only to those defendants who organized or supervised a fellow participant.[4]
 
 
 63
 The government does not dispute the district court's finding that the defendants were equally culpable. It does, however, contend that the adjustments were justified because the defendants organized and supervised criminally innocent employees and other non-culpable third parties in the execution of the crime. More specifically, the government argues that the defendants, as an essential element to carrying out their criminal scheme, set up dummy corporations and staffed those corporations with non-culpable employees. The organization and supervision of these employees was essential to the commission of the crime, the government further argues, because it was necessary to create the illusion of a viable business before Commercial Factors would enter into an agreement to purchase the accounts receivable.
 
 
 64
 The majority holds that, as a threshold to the application of §§ 3B1.1, the court must find that the defendant organized or supervised another participant, in contrast to a non-culpable third party. Majority Opinion, at 1405.[5] The majority's reasoning, as I understand it, essentially eschews the plain language of § 3B1.1. Instead, the majority relies on the commentary to Chapter 3, Part B[6] and our prior precedent holding that §§ 3B1.1 and 3B1.2 require, as a prerequisite to their application, the involvement of at least two participants, see United States v. Badaracco, 954 F.2d 928, 934 (3d Cir.1992); United States v. Bierley, 922 F.2d 1061, 1064-66 (3d Cir.1990).
 
 II. Plain Meaning
 Section 3B1.1 of the Guidelines provides:
 Aggravating Role
 
 65
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 66
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 67
 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 
 
 68
 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 
 
 69
 My disagreement with the majority's result stems primarily from what I believe to be a flaw in its approach to the interpretation of § 3B1.1(c). Simply stated, I believe the language of the section is, and should be, determinative in the present case. There is simply no indication whatsoever in the language of subsection (c) that its application is limited to the supervision of participants; the language simply states, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." U.S.S.G. § 3B1.1(c).[7]
 
 
 70
 The Seventh Circuit has arrived at the same conclusion as the majority by focusing on the language of § 3B1.1. See United States v. DeCicco, 899 F.2d 1531, 1536 (7th Cir.1990). In particular, the Seventh Circuit focused on subsection (c)'s omission of the "otherwise extensive" language that is found in subsections (a) and (b), concluding: "This omission demonstrates the Commission's intention that subsection (c) apply only to the organization of criminally responsible actors." Id. With respect, I find no such implication in the omission of "otherwise extensive" from subsection (c).
 
 
 71
 The Seventh Circuit's logic, as I understand it, is that by omitting "otherwise extensive," a term found in both subsections (a) and (b), the Commission evinced an intent to exclude from subsection (c) the class of criminal organizations encompassed by the term "otherwise extensive." Application Note 2 provides that in determining whether an organization is "otherwise extensive," the court looks to all those involved in the entire offense, including non-culpable outsiders. § 3B1.1, Application Note 2. Since subsection (c) excludes consideration of organizations comprised of non-culpable outsiders, the Seventh Circuit concluded that it must be restricted to "the organization of criminally responsible actors"; i.e., participants.
 
 
 72
 I find the Seventh Circuit's reasoning unpersuasive, however, because subsection (c) also omits the term "participant." Consistently applied, the Seventh Circuit's logic would suggest that the omission of "participant," a term also found in both subsections (a) and (b), evinces an intent on the part of the Commission to exclude criminal enterprises that involve multiple participants. Obviously, however, subsection (c) cannot exclude the organization of both criminally responsible and criminally non-culpable actors since interpreting subsection (c) in this way would render it a nullity.
 
 
 73
 If the omission of language from subsection (c) has meaning, it is in the fact that it does not contain the same extensiveness requirements found in subsections (a) and (b). By its express language, subsection (c) applies to "any criminal activity other than described in (a) or (b)." U.S.S.G. § 3B1.1(c) (emphasis added). Whatever extensiveness requirements may inhere in subsections (a) and (b), the omission of the terms "participant" and "otherwise extensive" from subsection (c) make it clear that it's application is not so limited. Accordingly, subsection (c) should apply whenever a defendant (1) supervises others in carrying out criminal activity; (2) the criminal enterprise is insufficiently extensive to fall under subsections (a) or (b) (i.e., it does not involve five participants or a sufficient number of non-culpable third parties to be considered "otherwise extensive"); and (3) the criminal enterprise involves at least two participants.[8]
 
 
 74
 Admittedly, neither § 3B1.1 nor the accompanying commentary define what constitutes an "organizer, leader, manager, or supervisor." As such, these terms should be given their common meaning. See United States v. Fuentes, 954 F.2d 151, 153 (3d Cir.1992) ("[I]t makes more sense to confine the terms 'managing or supervising' to the narrower sense in which they are commonly used, as referring to the management or supervision of other people."). There is nothing in the common usage of an organizer or supervisor that suggests limiting those terms to the organization or supervision of participants, as opposed to non-culpable third parties.
 
 
 75
 The Application Notes, while not defining the terms themselves, do attempt to provide some guidance in distinguishing leaders and organizers in subsection (a) from managers and supervisors in subsection (b). One of the factors to be considered in making that distinction is "the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, Application Note 3 (emphasis added).[9] It is telling, in a section that specifically defines "participant" as a term of art, that the expansive term "others" is used instead of "participant" to describe those over whom control and authority is exercised. In contrast, Application Note 3 to § 3B1.2 explicitly uses the term "participant" to explain who should be compared in determining whether a defendant is a minor participant. See U.S.S.G. § 3B1.2, Application Note 3 ("For purposes of § 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal.").[10]
 
 III. Guidelines Commentary and Prior Case Law
 
 76
 As discussed above, I believe that the majority has essentially eschewed reliance on the plain language of § 3B1.1. Rather, its conclusion that the defendant must have supervised another participant is based primarily on the commentary and prior case law. As I understand it, the majority derives from these sources an understanding that the overarching emphasis of § 3B1.1 is on relative culpability among the participants in a particular criminal activity. See Majority Opinion, at 1405 ("[A] common sense reading of sections 3B1.1 and 3B1.2, together with the commentary and caselaw, demonstrates that these two sections are meant to adjust for a defendant's responsibility in criminal activity relative to other participants."). The majority apparently infers from this emphasis that it would be fatuous to allow an adjustment for a defendant who did not organize or supervise a participant because, absent the organization or supervision of a participant, there is no guarantee that differing levels of culpability exist. Additionally, the majority argues that interpreting subsection (c) as applying to the leadership of non-culpable third parties "would create an unprincipled disparity" in sentencing under the section. Majority Opinion, at 1403.
 
 A. Prior Case Law
 
 77
 The linchpin of the majority's holding is its conclusion that interpreting subsection (c) as applying to the leadership of non-culpable third parties "would create an unprincipled disparity between, on the one hand, the sentence of a solo defendant who manages an outsider but who cannot receive the enhancement because of the threshold requirement [that there be at least two participants], and, on the other, the sentence of a defendant who manages an outsider but who happens to have a co-participant." Majority Opinion, at 1403. See Badaracco, 954 F.2d at 934-35 (reversing a two level enhancement under § 3B1.1(c) because the government had failed to prove that there was more than one participant involved in the crime).[11]
 
 
 78
 The majority is clearly correct that interpreting § 3B1.1(c) to apply to the organization or supervision of non-culpable third parties by co-participants will create a troubling disparity vis-a-vis sole participants who also supervise non-culpable third parties. The disparity problem, however, is not solved by the majority's interpretation, for under the majority's interpretation a co-defendant who led non-culpable third parties would receive the same sentence as a defendant who had no supervisory role at all.[12] In actuality, the problem of disparity is not created by our interpretation of subsection (c), but by the requirement that there must be two participants in order for § 3B1.1 to apply.[13] Since disparity will occur regardless of which interpretation is adopted, the concern for disparity is an insufficient basis for creating a limitation where none is suggested by the plain language of § 3B1.1(c).
 
 
 79
 It is difficult, if not impossible, to divine the Sentencing Commission's purpose in requiring the involvement of two participants as a prerequisite to the application of §§ 3B1.1 and 3B1.2. One possible explanation is that, as the majority seems to suggest, §§ 3B1.1 and 3B1.2 are concerned only with relative responsibility as between participants in a particular criminal enterprise. It is peculiar, however, that the Introductory Commentary does not explain its motivating concern or state the requirement explicitly. The Introductory Commentary merely states that §§ 3B1.1 and 3B1.2 may apply if the offense was committed by more than one participant. It requires a considerable extrapolation to conclude that § 3B1.1 therefore applies only to cases in which there is more than one participant and in which the defendant organized or supervised another participant.
 
 
 80
 Alternatively, the Introductory Commentary may have been motivated by a desire to establish some minimum level of extensiveness. The important point, however, is that it is impossible to divine the purpose behind the requirement or to fully rationalize the application of § 3B1.1. The Sentencing Commission has not explained its intent. Thus, the appropriate procedure is to abide by the language of the section absent a clear indication of intent by the Commission that the application of § 3B1.1(c) is limited to organizing or supervising a participant.
 
 
 81
 The majority also relies on prior case law to establish what it perceives to be § 3B1.1(c)'s overarching emphasis on the defendant's culpability relative to the other participants in the criminal enterprise. In particular, the majority relies on a passage from United States v. Bierley, 922 F.2d 1061, 1065 (3d Cir.1990), in which we stated that "the adjustments authorized for role in the offense are directed to the relative culpability of participants in group conduct." See Majority Opinion, at 1405. In Bierley, we considered whether §§ 3B1.1 and 3B1.2 applied to a criminal enterprise involving only one participant. 922 F.2d at 1064-66. Based largely on the language of the Introductory Commentary, which provides that "[w]hen an offense is committed by more than one participant, § 3B1.1 or § 3B1.2 (or neither) may apply," we concluded that §§ 3B1.1 and 3B1.2 require the involvement of more than one participant. Id. at 1065-66. This commentary, we believed, spoke directly to the question before the court, namely how many participants need to be involved in a criminal enterprise to trigger the provisions of §§ 3B1.1 and 3B1.2. Id. at 1066. Because the Introductory Commentary directly addressed the question, we concluded that it expressed the Sentencing Commission's intention to require the involvement of more than one participant. Id. The policy language quoted by the majority here was used as further support that our reading of the Introductory Commentary made sense in terms of the policy aims of §§ 3B1.1 and 3B1.2.
 
 
 82
 However, because we were only seeking an assurance that our reading of the Introductory Commentary made sense within the general scheme of §§ 3B1.1 and 3B1.2, we did not consider in Bierley whether § 3B1.1 addressed additional policies or what relative weight should be accorded those policies.[14] Accordingly, Bierley merely established that one of the policy aims of § 3B1.1 was to account for differing levels of culpability, a proposition that is entirely consistent with my interpretation of § 3B1.1, see, e.g., infra, at 1413, 1415.[15]
 
 
 83
 Moreover, Bierley serves to highlight what I believe is the interpretive error in the majority's approach. In Bierley, we had a textual basis, namely the Introductory Commentary, from which to conclude that the Sentencing Commission specifically intended to limit the application of §§ 3B1.1 and 3B1.2 to criminal enterprises involving at least two participants. Bierley, 922 F.2d at 1066 ("[W]e must attempt to ascertain the Sentencing Commission's intent. We can best determine that intent in this instance by reference to the applicable commentary."); id. ("We find persuasive the suggestion in the Guideline Commentary that there must be more than one 'participant' for any mitigating adjustment for Role in the Offense under U.S.S.G. § 3B1.2."). Here, in contrast, there is no language in the commentary that even remotely addresses whether § 3B1.1(c) requires the supervision of a participant, yet alone directly addresses the question. Instead, the majority here is using what it perceives to be the general policy of the section to establish a threshold requirement not suggested either by the text of § 3B1.1(c) or the commentary. This is a markedly different interpretive step than was taken in Bierley, and it is one that I believe, in this context, is mistaken, particularly because it is based on only one policy goal among the many embodied in § 3B1.1.[16]
 
 
 84
 My interpretation, in contrast, not only accounts for relative culpability among participants in cases where varying levels of culpability exist, but also accounts for the plain language of § 3B1.1(c) and the other policy goals (discussed infra ) embodied in the Guidelines.
 
 B. The Guidelines Commentary
 The Background to § 3B1.1 states:
 
 85
 This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.
 
 
 86
 In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility. This is reflected in the inclusiveness of § 3B1.1(c).
 
 
 87
 The Background simply never addresses limiting the application of § 3B1.1 to the organization or supervision of a participant. Although I have not bothered to quote them at length, the Application Notes to § 3B1.1 similarly make no reference to who must be organized or supervised. Contrast Bierley, 922 F.2d at 1065-66 (Introductory Commentary speaking directly to how many participants must be involved for § 3B1.1 to apply).
 
 
 88
 The majority argues that "[t]he Background to the section confirms that the adjustment for role in the offense 'is included primarily because of concerns about relative responsibility.' " Majority Opinion, at 1404 n. 7 (citation omitted). As is clear from this statement, the majority is not arguing that the commentary directly addresses who the defendant must have organized or supervised in order to receive an upward adjustment under § 3B1.1. Instead, its argument is based on what it perceives to be the commentary's general structure and policy.
 
 
 89
 I do not find the majority's reasoning persuasive. First, even taking the Background's statement "at face value," see id., the question remains as against whom the defendant's relative responsibility is to be compared. The majority restricts the comparison to the other participants in the crime. There is nothing in the language or the concept of relative responsibility that compels such an interpretation, however. Rather, a review of the use of the concept in the rest of Chapter 3, Part B suggests that when the Sentencing Commission wanted to restrict the concept of relative culpability to the participants, it explicitly so restricted it. See, e.g., U.S.S.G. § 3B1.2, Background ("This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." (emphasis added)). In contrast, where the Commission spoke of culpability without any such explicit limitation, the concept was clearly meant to apply broadly. See U.S.S.G. § 3B1.3, Background ("This adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime. Such persons generally are viewed as more culpable.").[17]
 
 
 90
 Second, as I read it, the Background does not compel the majority's overwhelming emphasis on relative culpability. This is not to say that relative culpability is irrelevant. To the contrary, it is an important consideration, and the Background reflects this. See U.S.S.G. § 3B1.1, Background ("This adjustment is included primarily because of concerns about relative responsibility."); see also Bierley, 922 F.2d at 1065. At the same time, however, the Background also reflects concern about a variety of other factors, including the size of the criminal organization, the likelihood that organizers and supervisors profit more from criminal activity, the likelihood that they will recidivate, and the likelihood that they will cause greater harm to the public. See U.S.S.G. § 3B1.1, Background.
 
 
 91
 Finally, because of drafting problems and a general lack of clarity, the Background provides a particularly tenuous source for establishing a general policy concern sufficient to overcome the unrestricted language of the section. The Background begins with the suggestion that § 3B1.1 implicates two primary concerns, the size of the criminal organization and the degree of a defendant's responsibility in committing the offense.[18] In the next sentence, however, the Background provides that adjustments for an aggravating role are primarily motivated by concerns about relative responsibility. Finally, after first mentioning yet another set of relevant concerns, the Background seems to come full circle, repeating its original statement that application of § 3B1.1 is motivated by the size of the organization and the degree of the defendant's responsibility. This structure is, if not internally inconsistent, at least highly schizophrenic. Relying on one particular sentence or factor to discern an overarching policy sufficient to create a limitation not reflected in the language of § 3B1.1 is highly problematic. Accordingly, at the very least, the Sentencing Commission should consider amending or redrafting this commentary, if not the section itself.
 
 
 92
 In addition to not compelling the majority's result, I believe that the Background is, on the whole, more consistent with my view of the case. As opposed to the majority's interpretation, which would raise relative culpability among participants to the level of a threshold consideration, thereby excluding consideration of any other interest where the threshold is not met, my interpretation of § 3B1.1(c) is consistent with the Background's multi-factor approach. Indeed, my interpretation is further supported by the second paragraph of the Background, which provides that there is less concern about relative responsibility among participants in the relatively smaller, less extensive criminal enterprises to which subsection (c) applies. U.S.S.G. § 3B1.1, Background.
 
 
 93
 In sum, I do not believe that the majority's result is compelled by the commentary to Chapter 3, Part B. The commentary never directly addresses who must be organized or supervised. Additionally, the commentary tends, as a general matter, to be ambiguous, opaque, and, in parts, internally inconsistent. Accordingly, it is impossible to discern from the commentary any single, over-arching policy that dictates a particular result in this case.
 
 IV. Guidelines Policy
 
 94
 While the majority's decision that application of § 3B1.1 requires a defendant to have organized or supervised at least one other participant is based on what it perceives to be the overarching policy concern of § 3B1.1, I find its result troubling in terms of the general policy of the Guidelines. As I have noted, the majority arrives at its result by placing overwhelming emphasis on its idea of relative culpability. The majority's idea of relative culpability, however, is limited to the participants in the particular criminal enterprise. This narrow interpretation of relative responsibility ignores the Guidelines' additional concern for relative responsibility across the universe of federal defendants. See, e.g., S.Rep. No. 225, 98th Cong., 2d Sess. 39, reprinted in 1984 U.S.C.C.A.N. 3182, 3183, 3222 (One of the goals of the Sentencing Reform Act is to "assure that sentences are fair both to the offender and to society, and that such fairness is reflected both in the individual case and in the pattern of sentences in all Federal criminal cases.").
 
 
 95
 I believe, however, that the government's rejected interpretation not only accounts for the differing roles and levels of culpability that may exist between participants, but also accounts for differing roles and culpabilities across the universe of federal defendants. Defendants who organize or supervise others, including non-culpable third parties, are differently situated from those who take on no such leadership role because criminals who take on an organizational or supervisory role are likely to cause greater harm through their criminal activity and should, therefore, receive increased sentences.
 
 
 96
 A concern for harm, I believe, is central to the philosophy of the Guidelines and is its most important policy concern. Cf. Alschuler, supra, at 908-15 (criticizing the move to a harm-based penology in the Guidelines and sentencing generally). In fact, a focus on the quantification of relative harm undergirds the entire structure of the Sentencing Guidelines.[19]
 
 
 97
 Application of the Guidelines begins with the assignment of a base offense level from the appropriate offense guideline in Chapter 2 based on the defendant's offense of conviction. U.S.S.G. § 1B1.1(a)-(b). Adjustments are then made according to a number of offense characteristics specific to the offense guideline, U.S.S.G. § 1B1.1(b). While the purpose of sentencing has long been a matter of philosophical debate, it cannot seriously be argued that the base offense level, which was based largely on an empirical analysis of the length of sentences given for particular crimes, does not reflect the severity or amount of harm caused by a particular crime. See U.S.S.G. Chapter One, Part A3, The Basic Approach (Policy Statement). Similarly, a review of specific offense characteristics demonstrates that they are predominately addressed to the extent of harm likely to be caused by particular criminal conduct. The specific offense characteristics in § 2F1.1, the section under which Katora and Squire were sentenced, exemplify this. Adjustments are made for, among other things, the amount of the victim's loss, the level of planning, the number of intended victims, and the likelihood of threatening the safety and soundness of a financial institution. U.S.S.G. § 2F1.1(b). These various factors all have an impact on the likelihood or extent of the harm caused by a particular defendant's criminal conduct.
 
 
 98
 There is no reason to believe that Part B to Chapter 3 is animated by a different philosophy. To the contrary, the structure of § 3B1.1, by adjusting for both extensiveness of the enterprise and the defendants level of responsibility, embraces the same general concern for the level and likelihood of harm. Thus, it seems compelling to hold that a defendant who organizes and supervises a number of others, even though they are unwitting third-parties, is subject to an upward adjustment under § 3B1.1(c); defendants who organize or supervise others have more potential to cause harm through criminal activity than defendants who do not take on leadership roles.
 
 
 99
 Moreover, a focus on harm is consistent with the third provision of Part B, § 3B1.3. Section 3B1.3 provides for an adjustment based on an abuse of a position of trust or the use of a special skill in committing the crime. This is a classic reflection of increasing the potential sentence based on the increased likelihood of harm. It is not, however, explicable in terms of the majority's idea of relative responsibility. Thus, reading § 3B1.1(c) as being motivated by concerns for relative harm has the additional virtue of harmonizing the policy aims of all of Part B of Chapter 3.
 
 V. Summary
 
 100
 My disagreement with the majority's conclusion that § 3B1.1(c) requires the supervision of a participant stems, at bottom, from a disagreement over the treatment of the plain language of § 3B1.1(c). As I read it, the plain language of § 3B1.1(c) does not suggest any limitation on who must be organized or supervised. As such, I do not believe that such a requirement should be read into § 3B1.1(c) unless there is a clear indication in the commentary that the Sentencing Commission intended such a limitation. In the present case, I am unable to perceive any clear indication that the Sentencing Commission intended to restrict the application of § 3B1.1(c) to the organization or supervision of participants.
 
 
 101
 To the contrary, the commentary at no point directly addresses who must be supervised. Additionally, I do not believe that the commentary evinces an overarching policy sufficient to evince the Commission's intent. The majority's opinion, as I understand it, derives from the commentary an overarching emphasis on the defendant's culpability relative to the other participants in a particular criminal enterprise. While relative responsibility is a primary interest of § 3B1.1, it is not its only interest. Moreover, it is far from clear that the Background's emphasis on relative responsibility is limited to a defendant's responsibility relative to the other participants, as opposed to defendants generally. Rather, the Guidelines' concern for accounting for the harm likely to be caused by different types of criminal conduct suggests a broader focus. To account for the additional harm likely to be caused by the supervision of non-culpable third parties, the inquiry must concern more than a defendant's culpability relative to participants; it must also focus on a defendant's culpability relative to defendants who supervise no one.
 
 
 102
 The majority also relies on prior case law in establishing a limitation on the applicability of § 3B1.1(c). In particular, the majority argues that our interpretation in Badaracco, 954 F.2d at 934, and the government's position in this case would create an untoward sentencing disparity between a sole participant who leads non-culpable third parties and co-participants who lead non-culpable third parties. The irrationality about which the majority is rightfully concerned is unavoidable, however, for even the majority's interpretation creates an equal disparity. Although defendants who supervise non-culpable third parties and defendants who take on no supervisory roles are dissimilarly situated in a way that is important to the Guidelines, namely their roles in the offense as supervisors and non-supervisors, the majority's interpretation would result in these differently situated defendants being treated the same. Since the disparity cannot be eliminated, I do not believe that Badaracco mandates a particular result in this case.
 
 
 103
 In the absence of either commentary clearly reflecting the Sentencing Commission's intent or prior case law that mandates a particular result, I believe our inquiry should be addressed to the plain language of § 3B1.1(c), which, as I read it, contains nothing suggesting that § 3B1.1(c) applies only to the organization or supervision of participants, rather than applying to non-culpable third parties as well.
 
 VI. Application to this Case
 
 104
 The district court found that "Katora both conceptualized and created Jobs 900 and shared much if not most of the final decision making authority that led to the implementation of the fraud perpetrated upon Commercial Factors and MCI by Jobs 900, R.M. Inc., and Fourth Audio Cash," United States v. Katora, No. 90-217, Tentative Findings and Rulings at 9 (W.D.Pa. July 26, 1991), and that "Squire shared most of the final decision making authority [and].... [h]is role in organizing and staffing R.M. Inc. and Fourth Audio Cash, along with his numerous directives to MCI and Commercial Factors representatives, highlights his role in the offense as a organizer, leader and a manager," United States v. Squire, No. 90-217, Tentative Findings and Rulings at 3 (W.D.Pa. July 26, 1991). The district court also found that "[t]here is a unique situation in that both defendants have separate corporations; Jobs 900, which was, as I see it, the vehicle of Dr. Katora, dominated by him, and the co-defendant, Squire, organized Fourth Audio Cash, R.M., Inc., and the information organizations which were mentioned in the evidence during the trial...." Transcript of Katora's Sentencing Hearing at 9-10 (July 29, 1991).
 
 
 105
 I would hold that the district court's decision to adjust Katora's and Squire's sentences upward under § 3B1.1(c) is, as a matter of law, not barred by the fact that the defendants were equally culpable and that they organized or supervised non-culpable third parties. Regardless of Katora's and Squire's culpability relative to one another, they are more culpable than defendants who do not organize or supervise anyone because their roles as organizers and supervisors, even of non-culpable third parties, increased the likelihood that they would cause greater harm than those who take on no leadership role. I would therefore affirm the district court's legal conclusions, but remand this case for more detailed factfinding on the question of role in the offense and possible resentencing in conformity with this opinion.[20] In this respect, I respectfully dissent.
 
 
 
 [1]
 Katora and Squire contended that there was insufficient evidence to support a conviction; that there was an improper variance between the indictment and proof presented at trial; that the district court erred when it refused to allow evidence of MCI's factoring program; that the district court erroneously allowed a witness without personal knowledge to testify; that the district court erred in denying Katora's motion for a new trial; and that the judge incorrectly charged the jury regarding intent to repay in fraud cases. Katora also challenged the judge's order that he pay restitution. In addition, Squire challenged the district court's denial of his motion to join in Katora's motion for a new trial
 
 
 [2]
 For example, after shipping $100,000 worth of widgets, a widget manufacturer might take the $100,000 in accounts receivable to a factor. The factor would buy the right to collect the $100,000. The amount the factor would pay its client (the manufacturer) depends on the time-value of money, on the likelihood that the client's customers will pay for the widgets, and on the factor's own profit margin. Thus the factor might pay $50,000 to the manufacturer for the right to collect $100,000 later. If the factor were to receive the full $100,000 from the manufacturer's customers, the factor might then also pay an additional sum to its client, the manufacturer
 
 
 [3]
 The dissent essentially relegates Badaracco to a footnote and, while arguing about disparity, downplays the simple disparity created by penalizing these defendants but not Badaracco
 
 
 [4]
 In contrast to our view of disparity, which is premised on the disparity between punishing these defendants but not a solo offender, the dissent's disparity argument is premised on the view that the management of other criminal participants is no worse than the management of non-culpable outsiders. Although the latter is reprehensible, it is certainly logical to distinguish the two. Arguably, the management of participants presents a greater danger to the public because, unlike a non-culpable party, even a minimally informed participant can take individual action to accomplish a crime. But regardless of whether one type of management is worse, our view of disparity is premised on § 3B1.1's inability to punish identical conduct (management of outsiders), whereas the dissent's view is premised in part on the section's inability to punish two different, albeit similar, forms of conduct (management of participants versus management of outsiders)
 Thus the dissent's example of "disparity" of the sentences of two defendants, defendant A who managed an unindicted participant and defendant B who managed a non-culpable party, fails because--although A would receive the increase and B would not--their predicate behavior differs. (The dissent also ignores that Badaracco would prohibit applying § 3B1.1(c) to defendant B in any event.)
 The rest of the dissent's concern for "disparity" stems from the unfairness that results from imposing no greater sentence on the "organizer" of outsiders than on the non-organizer. However well-founded the dissent's concern may be, we find the dissent's solution--that of extending the application of § 3B1.1(c) to those deemed deserving of additional punishment--to be inconsistent with Badaracco in which we declined to apply § 3B1.1(c) to the solo organizer of outsiders, who presumably deserved greater punishment than a comparable "non-organizer."
 
 
 [5]
 The distinction made by the dissent between Fuentes and the case at bar is based on the obvious difference between manipulation of things (which are always "innocent") and manipulation of innocent people. The central fallacy of this distinction is that it makes no more sense to evaluate an offender's responsibility in relation to a innocent non-participant than it does to evaluate an offender's responsibility in relation to "innocent" tangibles or intangibles. In either case the participant will be deemed "more" responsible because, by definition, neither things nor non-participants are ever culpable
 The logical extension of the a distinction between things and people would lead to some rather disparate results. For example, offenders who rent a car to transport stolen goods across the state line would not be penalized, but the same offenders would if they direct a cab driver instead; offenders who conduct mail fraud from their home would not be penalized, but the same offenders would be penalized if they hired an innocent teenager to lick stamps and carry mail bags.
 Indeed, because the employees manipulated by Katora and Squire were themselves victims of the fraud, the dissent's approach may lead to even more bizarre results: bank robbers "supervising" tellers who put cash in bags and extortionists "organizing" their victims into compliance would both be entitled to enhancement under the dissent's theory.
 Furthermore, the dissent merely dismisses as dicta the underpinnings of our reasoning in Fuentes that "[w]hen the terms 'manage' and 'supervise' are applied to the management or suppression of other persons, they serve well the purpose of assigning relative fault among criminal coadventurers." Id. at 153 (emphasis added). In no sense can a non-participant be considered a coadventurer, and, as demonstrated in the examples above, it is as pointless to assess an offender's relative fault by reference to the innocent as it is to assess it by reference to things. Either assessment inevitably leads to assessment of greater relative fault.
 
 
 [6]
 The dissent does not discuss the significance of the title and first clause of § 3B1.1
 
 
 [7]
 The Background to the section confirms that the adjustment for role in the offense "is included primarily because of concerns about relative responsibility." U.S.S.G. § 3B1.1 Background. Although the dissent opines that the Background suffers from "a general lack of clarity," Typescript at 20, we take the word "primary" at face value. Thus, notwithstanding other concerns expressed in the Background, it clearly sets a priority on relative responsibility
 Contrary to the dissent's reading, the second paragraph of the Background does not retreat from the importance of relative responsibility. Rather it merely de-emphasizes the necessity for a strict hierarchy in smaller criminal enterprises.
 Our threshold requirement flows from the obvious importance of relative responsibility coupled with the threshold requirement of "more than one participant." If the guideline were meant to address equally the "multi-faceted" concerns listed by the dissent, then it would presumably apply to solo offenders. The dissent concedes that it does not.
 
 
 [8]
 The dissent's reliance on the use of "others" in Application Note 3, which lists a defendant's "control of others" as a factor to determine leadership, is misplaced. The word "others" is ambiguous, meaning either "other participants" or "other people."
 Moreover, by ignoring the first sentence of Application Note 3, the dissent ignores the probability that "control of others" is only a factor to be considered "[i]n distinguishing a leadership or organizational role from one of mere management or supervision," not a factor to be considered in defining who is an organizer or manager or to whom § 3B1.1 applies initially.
 Similarly, by ignoring the third sentence of Application Note 3, the dissent ignores the indication that the section applies to "a criminal association or conspiracy," groups in which outsiders are not counted.
 
 
 [9]
 The dissent relies on the obvious harmfulness of involving innocent outsiders to argue that the guidelines' policy of punishing harmful conduct counsels an inclusive reading of section 3B1.1. To the contrary, the dissent's reliance on "harm" simply begs the question, "To which particular harm is section 3B1.1 addressed?" The threshold requirement of more than one participant--imposed not by this opinion but by the guidelines and precedent--would suggest that the specific harm addressed is the role among participants in the offense
 
 
 [10]
 The dissent eschews what amounts to reasonable interpretation of § 3B1.1--that § 3B1.1 increases the sentence for the more culpable participants in a criminal conspiracy in proportion to the participant's role and the extensiveness of the crime. Instead, the dissent chooses a nebulous "multifaceted" approach that--despite a lengthy treatment--finds little or no real support in the text of the section or its commentary, offers no concrete criteria for determining when a non-culpable party has been "organized, led, managed, or supervised," and ultimately gives the government an automatic two-level enhancement whenever it can find a warm body in the vicinity of a crime
 
 
 [11]
 Katora and Squire objected to the $3.6 million figure only insofar as it was used in the presentence report to calculate loss. R. at 2217, 2256
 
 
 [12]
 Indeed, in his response to the presentence report Katora primarily argued that MCI was not a victim and did not suffer a loss. (R. 2252-60.) Although Katora argued that Commercial Factors' loss was less than $250,000, Katora appeared to acknowledge that "the only reasonable interpretation of the maximum loss [to Commercial Factors] was $250,000." (R. at 2260.)
 
 
 [1]
 For the sake of brevity, I use "organized or supervised" or simply "supervised" as shorthand for the various aggravating roles under § 3B1.1
 
 
 [2]
 I do not disagree with the majority's holding that there can be no upward adjustment under § 3B1.1(c) when there are only two equally culpable participants, neither of which organized or supervised anyone else in committing the crime. See Majority Opinion, at 1402; see also United States v. Fuentes, 954 F.2d 151, 154 (3d Cir.) (holding "that a defendant's offense level may not be increased under [§ 3B1.1] in the absence of evidence that he or she managed or supervised someone else."), cert. denied, --- U.S. ----, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992)
 
 
 [3]
 The district court observed in this regard: "There is a unique situation in that both defendants have separate corporations; Jobs 900, which was, as I see it, the vehicle of Dr. Katora, dominated by him, and the co-defendant, Squire, organized Fourth Audio Cash, RM, Inc., and the information organizations which were mentioned in the evidence during the trial...." Transcript of Katora's Sentencing Hearing at 9-10 (July 29, 1991)
 
 
 [4]
 As used in § 3B1.1, "participant" is a term of art: "A 'participant' is a person who is criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1, Application Note 1. Therefore, when I refer to "participants," I am using that term in the narrow manner in which it is defined in the Guidelines. In contrast, I will refer to those who were involved in the criminal activity but were not "criminally responsible" as "non-culpable third parties" or in other similar terms
 
 
 [5]
 With regard to these defendants, the majority concludes that "because the only two participants were equally culpable and, furthermore, because they did not organize, lead, manage or supervise a third participant, neither section 3B1.1 nor section 3B1.2 could apply." Majority Opinion, at 1405
 
 
 [6]
 When commentary is spelled with a lower case "c," it is intended to denote the commentary generally. There are also, however, a variety of specific types of commentary within the Guidelines; e.g., Application Notes and Background. Unfortunately, at least from the point of view of clarity, there are also specific types of commentary called Introductory Commentary and simply Commentary. In an attempt to reduce the confusion as much as possible, I will capitalize all references to specific types of commentary
 
 
 [7]
 The majority argues that "[t]he title and the first clause of section 3B1.1 indicate that the defendant's 'role in the offense' is the central criterion for application; size, or 'extensiveness,' of the activity is secondary." Majority Opinion, at 1404. I do not disagree with that statement. Where the majority and I do differ, however, is in respect to whom a defendant is to be compared against to determine his role in the offense. The majority interprets "role in the offense" narrowly, considering only the defendant's role relative to the other participants in the particular criminal activity. In contrast, I believe that role in the offense includes not only consideration of the defendant's role relative to other participants but also his or her role relative to defendants generally. This broader interpretation, I believe, better comports with the Guidelines' concern with the harm caused by particular criminal conduct. In the instant context, defendants who organize and supervise others are apt to cause more harm than defendants who do not take on an organizational or supervisory role. See, infra, at 1415-16
 
 
 [8]
 The last requirement is established not by the language of the section but by prior case law. See United States v. Badaracco, 954 F.2d 928, 934 (3d Cir.1992); United States v. Bierley, 922 F.2d 1061, 1065-66 (3d Cir.1990)
 
 
 [9]
 In full, Application Note 3 provides:
 In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.
 See also United States v. Ortiz, 878 F.2d 125, 127 (3d Cir.1989). These factors cover a broad range of interests and concerns. The list, however, is not intended to be exhaustive, and evidence on each of the factors is not required to support an adjustment. Id.
 
 
 [10]
 The majority points out that the term "others" is ambiguous and argues that our reliance on it is therefore misplaced. See Majority Opinion, at 1404 n. 8. This ambiguity, however, actually enforces my point. Section 3B1.1 contains a very specific term of art--"participant"--that the Commission could have used to make its intent clear. If the Sentencing Commission intended the relevant organization or supervision to be limited to participants, it is strange that it chose to use an ambiguous term to discuss over whom control and authority is exercised, as opposed to the specific term of art--participants
 Moreover, the majority's comment points out what I believe is its flawed starting premise. Nothing in the language of § 3B1.1(c) suggests that it is limited to the organization or supervision of participants. Absent the indication of a limitation in the section itself, the presumption should be that no such limitation exists. Accordingly, it should be incumbent on the party attempting to create a limitation where none is indicated on the face of the section to demonstrate the Commission's intention to limit the section's application.
 
 
 [11]
 Badaracco is based on our prior decision in United States v. Bierley, 922 F.2d 1061, 1066 (3d Cir.1990), in which we held:
 We find persuasive the suggestion in the Guideline Commentary that there must be more than one "participant" for any mitigating adjustment for Role in the Offense under U.S.S.G. § 3B1.2.
 
 
 [12]
 The notion of disparity comprehends not only treating similarly situated defendants differently, but also treating defendants who are dissimilarly situated in some relevant way the same. See U.S.S.G. Chapter One, Part A3, The Basic Approach (Policy Statement) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."); cf. Stephen J. Schulhofer, Assessing the Federal Sentencing Guidelines--The Problem is Uniformity, not Disparity, 29 Am.Crim.L.Rev. 833, 851 (1992) ("In my view the most important concern in the current sentencing system is the opposite--not excessive disparity, but excessive uniformity. The federal sentencing process is pervaded by unwarranted similarities in the treatment of substantively distinguishable cases." (emphasis in original)); Albert W. Alschuler, The Failure of Sentencing Guidelines: A Plea for Less Aggregation, 901, 949-50 (1991)
 
 
 [13]
 The majority suggests that its distinction makes more sense because, "[a]rguably, the management of participants presents a greater danger to the public" than does the management of non-culpable third parties. Majority Opinion, at 1403 n. 4. While this suggestion seems initially plausible, I cannot accept its underlying premise. The leadership of non-culpable third parties will in many cases cause greater harm than the leadership of participants, and vice versa. A generalization simply cannot be made with regard to which situation is apt to cause greater harm. Moreover, such a distinction, if it were to exist, would not eliminate the disparity created by treating in the same manner defendants who do and those who do not supervise others
 
 
 [14]
 Further, the structure of § 3B1.1, which varies the amount of the upward adjustment based not just on relative culpability, but also based on the extensiveness of the criminal enterprise, belies any suggestion that § 3B1.1 is concerned only with relative culpability among participants in a particular criminal enterprise. See U.S.S.G. § 3B1.1; see also Majority Opinion, at 1405 ("[T]he severity of the enhancement increases as a function of both relative culpability and extensiveness of the crime."); infra, op. at 1415 (discussing the multiple concerns relevant to § 3B1.1)
 
 
 [15]
 It is also, at least arguable, that the policy language in Bierley ("adjustments authorized for role in the offense are directed to the relative culpability of participants in group conduct") was dicta because it was not essential to our resolution of the case given our interpretation of the Introductory Commentary. I do not rely on this argument, however, because for the reasons stated, supra and infra, I do not believe that this language is contrary to the government's position
 
 
 [16]
 The majority also relies on United States v. Fuentes, 954 F.2d 151, 153-54 (3d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992). In Fuentes, we held that § 3B1.1 applies only to the management or supervision of people, not tangible or intangible things. In support of that conclusion, we quoted the language from Bierley that "adjustments authorized [by §§ 3B1.1 and 3B1.2] for role in the offense are directed to the relative culpability of participants in group conduct" and opined that limiting § 3B1.1 to the supervision of people "serve[s] well the purpose of assigning relative fault among criminal coadventurers." Id. at 153. Fuentes presented a diametrically different issue than is presented here. Additionally, as with Bierley, there is no suggestion in Fuentes that no other policy interests are relevant to § 3B1.1
 The majority, however, suggests that "[i]t would surely create disparate sentencing treatment to exempt the superintendent of a crack house while penalizing the supervisor of a non-culpable employee." Majority Opinion, at 1404. While the majority recognizes that there is an obvious difference between things and people, it nevertheless concludes that distinguishing between things and non-culpable outsiders is fallacious in this context because both are "innocent"; i.e., that it makes no more sense to compare a participant's culpability relative to an innocent person than relative to an innocent thing, and a participant is by definition going to be more culpable than either an "innocent" person or thing.
 The majority's argument, however, turns on the assumption that a defendant's culpability is measured solely in relation to the others involved in the particular criminal enterprise; an assumption with which I disagree. Rather, I believe that the concept of relative responsibility referred to in the Background, see U.S.S.G. § 3B1.1, is broader than the majority's narrow interpretation. Relative responsibility encompasses not only a defendant's culpability relative to other participants, but also relative to other defendants who do not lead others, including non-culpable third parties, in committing a criminal offense.
 
 
 [17]
 Additionally, it is worth considering why we are concerned with relative responsibility. Part of the reason is certainly an idea of fairness and proportionality as to the defendants before the court. If that is the only reason, however, then § 3B1.1 is a particularly imperfect instrument for achieving that end. As the instant case demonstrates, under the majority's rule an adjustment often will be barred even though there is no relative unfairness as between the defendants--the district court determined that Katora and Squire were equally culpable and they received equal adjustments under § 3B1.1(c). Further, the majority's rule focuses on participants, as opposed to convicted defendants. Since a participant "need not have been convicted," U.S.S.G. § 3B1.1, Application Note 1, there will be cases in which a defendant receives an upward adjustment for supervising a participant, but the supervised participant is never sentenced. It is difficult to see how fairness or proportionality within a particular crime is furthered more in a case where the supervised party is an uncharged participant than where he or she is a non-culpable outsider. In both cases, the only person sentenced will be the convicted supervisor, and there will be no other sentenced party from that crime against whom to compare the "fairness" of the defendant's sentence
 Section 3B1.1 becomes more rational and coherent, however, if the relevant considerations include both proportionality more generally and the increased harm likely to be caused by defendants who organize and lead others. Since defendants who organize or supervise others are apt to cause greater harm than those who do not take on organizational or supervisory roles, a sentencing regime that is concerned with harms would, as a matter of proportionality, seek to punish those defendants more severely. See U.S.S.G. Chapter One, Part A3, The Basic Approach (Policy Statement) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.").
 
 
 [18]
 Here, the Background also seems to contradict the section itself. The Background defines the size of the criminal organization in terms of the number of participants. Subsections (a) and (b), however, specifically provide for consideration of non-participants in evaluating the size of the criminal enterprise by applying to cases where the "criminal activity ... was otherwise extensive." See U.S.S.G. § 3B1.1(a) & (b)
 
 
 [19]
 This is not to suggest that the quantification of harms is a matter of simple addition. Such an approach is specifically rejected in the Guidelines:
 Sentencing courts do not treat the occurrence of a simple bruise identically in all cases, irrespective of whether that bruise occurred in the context of a bank robbery or in the context of a breach of peace. This is so, in part, because the risk that such a harm will occur differs depending on the underlying offense with which it is connected; and also because, in part, the relationship between punishment and multiple harms is not simply additive.
 U.S.S.G. Chapter One, Part A3, The Basic Approach (Policy Statement).
 
 
 [20]
 The defendants have also raised a second argument on appeal. They contend (alternatively) that their adjustments under § 3B1.1(c) were inappropriate because the district court's conclusion that they were organizers and supervisors was based solely on their having planned the offense, and that upward adjustments based on planning were unjustified because they already received two level increases for "more than minimal planning" under § 2F1.1(b)(2)(A). The government responds that the upward adjustments for role in the offense were not based on their planning but on their organization and supervision of criminally innocent employees and other non-culpable third parties who were necessary to the execution of the criminal activity. The exact bases for the court's conclusions are unclear, however. Accordingly, I would remand for more specific findings of fact on that issue
 It should be recognized that there needs to be a strong connection between the non-culpable third parties, the crime, and a defendant's organization or supervision. Accordingly, I would specifically direct the district court on remand to consider the non-culpable third parties' level of involvement in the offense and the level of organization or supervision by each of the defendants in committing these offenses. Cf. United States v. Belletiere, 971 F.2d 961, 968-72 (3d Cir.1992) (holding that a drug dealer did not lead or organize his buyers).