PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2417
_____

UNITED STATES OF AMERICA

v.

THUNG VAN HUYNH,

Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 4-14-cr-00275-002)
District Judge: Honorable Malachy E. Mannion
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 26, 2018

Before: HARDIMAN, VANASKIE, and SHWARTZ,
*Circuit Judges*.

(Filed:  March 6, 2018)

George J. Rocktashel
Office of United States Attorney
240 West Third Street, Suite 316
Williamsport, PA 17701
       *Attorney for Appellee*

Edward J. Rymsza, III
Miele & Rymsza, P.C.
125 East Third Street
Williamsport, PA 17701
       *Attorney for Appellant*

_____

## OPINION OF THE COURT

_____

HARDIMAN, *Circuit Judge*.

Thung Van Huynh pleaded guilty in the United States District Court for the Middle District of Pennsylvania to conspiracy to commit bank and wire fraud. The District Court sentenced Huynh to 70 months' imprisonment in part based on its findings that he was subject to sentencing enhancements for being an organizer or leader of the conspiracy and for relocating the conspiracy to evade detection by the authorities. Huynh now argues that neither enhancement was warranted and that the Government breached its plea agreement with him at the sentencing hearing. For the reasons that follow, we will affirm.

I

This case involves a scheme to fraudulently purchase luxury wristwatches at jewelry stores throughout the country. To finance the purchases, which totaled $815,553, Huynh and his co-conspirators used loans they obtained through identity theft. Huynh paid an employee of a California car dealership to give him identification and credit reporting information from customer records. Using the stolen information and photographs of his co-conspirators, Huynh arranged for counterfeit driver's licenses and credit cards to be made in the victims' names.

At dozens of jewelry stores in 16 states, Huynh's co-conspirators used the counterfeit licenses and credit cards to apply to various financial institutions for credit in the amount of each watch purchase. Huynh then sold the watches to a woman in California who served as a fence for the scheme. Huynh used the proceeds to cover all of the scheme's expenses and compensate his co-conspirators, keeping a share for himself. Huynh selected the jewelry stores, made all travel arrangements, and supplied his co-conspirators with the personal information of the defrauded individuals. On two occasions, law enforcement stopped Huynh around the time conspirators purchased watches. Specifically, Huynh and a co-conspirator were detained in Michigan at the United States-Canada border, where border agents "recovered the fraudulently obtained watches and counterfeit driver's licenses." PSR ¶ 17. Huynh "falsely told the agents that he had purchased the watches with money won at the casinos." *Id.* Two months later, Huynh and a different co-conspirator went to a store in Texas and attempted to purchase a luxury watch, but "store personnel alerted the police." PSR ¶ 19. Huynh's co-conspirator was arrested. Based upon information

from the store's employees, a police officer approached Huynh, who was standing in the parking lot near the store. Huynh falsely told the officer he had no connection to the co-conspirator. Huynh did not return to either Michigan or Texas after these interactions with law enforcement but continued to make fraudulent transactions in several other states.

As part of a written agreement, Huynh pleaded guilty to conspiracy to commit bank and wire fraud in violation of 18 U.S.C. § 1349. Huynh and the Government stipulated as to how certain provisions of USSG § 2B1.1 (the Guideline for fraud-related offenses) applied to Huynh's sentencing. In Paragraph 10 of the agreement, the parties stipulated to: a base offense level of seven under § 2B1.1(a)(1); a 12-level increase under § 2B1.1(b)(1)(G) based on the amount of loss; a two-level increase under § 2B1.1(b)(2)(A) based on the number of victims; and a two-level increase under § 2B1.1(b)(11) because the scheme used an unlawfully produced means of identification. After a three-level reduction for acceptance of responsibility, Paragraph 10 established Huynh's total offense level at 20. At the same time, the Government reserved the right to seek an additional four-level enhancement under USSG § 3B1.1(a) for Huynh's role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

Also at issue in this appeal is the applicability of the two-level enhancement under Guidelines § 2B1.1(b)(10)(A) for relocating "a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials." Huynh's plea agreement was silent as to the application of that enhancement, but the Government retained significant flexibility in responding to questions by the District Court and

providing the Court with information the Government deemed relevant to the application of the Guidelines or other sentencing issues. The Presentence Investigation Report (PSR) prepared by the Probation Office applied the two-level "relocation" enhancement and the four-level "organizer or leader enhancement" to Huynh's offense level. Huynh objected to both enhancements before sentencing.

At the sentencing hearing, the District Court overruled both of Huynh's objections. After determining that the plea agreement did not "specifically exclude" the relocation enhancement, the Court asked the Government for its position on the enhancement's applicability. App. 17. The Government responded that it was "really taking no position" and did not "want to be viewed as undermining the plea agreement," but noted that the agreement expressly provides that the Government was not restricted in responding to the Court's questions regarding the application of the Guidelines. *Id.* The Court then repeated its question more specifically: did Huynh's travel back and forth from his home in California to make fraudulent purchases at jewelry stores across the country constitute relocation under § 2B1.1(b)(10)(A)? In response, the Government offered an analysis of the facts and relevant caselaw that, in effect, supported Huynh's principal argument. The Government agreed with Huynh that while "[m]ovement was integral to the conspiracy[,] . . . it was integral more for economic reasons than for evading law enforcement." App. 19. Thereafter, the Government's only significant comment on the enhancement was a confirmation, at the Court's request, that the Court correctly understood that the scheme was focused primarily on locations in the eastern half of the country despite Rolex watches being sold nationwide.

5

After hearing Huynh's arguments and reviewing the offense conduct as described in the PSR, which it adopted in full, the Court agreed with the Probation Office that the relocation enhancement applied. The Court based this determination on Huynh's pattern of targeting jewelry stores at great distances from California and from one another, as well as specific instances of apparent efforts to evade detection by the authorities. The Court also overruled Huynh's objection to the organizer or leader enhancement, agreeing with the Government that Huynh was the "leader and organizer of [the] group," that the scheme involved the requisite five or more participants, and that even if it did not, it was "otherwise extensive," as required by § 3B1.1(a). App. 28. As a result, Huynh's final offense level was 26, and his Guidelines imprisonment range was 70 to 87 months. In addition to restitution and a special assessment, the District Court sentenced Huynh to 70 months' imprisonment and three years of supervised release. Huynh filed a timely notice of appeal.

II

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

In general, "[w]e review the District Court's application of the Guidelines to facts for abuse of discretion" and its factual findings for clear error. *United States v. Tupone*, 442 F.3d 145, 149 (3d Cir. 2006). But where the Guidelines "set[] forth a predominantly fact-driven test," these two standards become indistinguishable, because we would find that the Court had "abused its discretion in applying the enhancement based on a particular set of facts

6

only if those facts were clearly erroneous." *United States v. Richards*, 674 F.3d 215, 223 (3d Cir. 2012). We have already held that the organizer or leader enhancement of § 3B1.1(a) sets forth such a fact-driven test. *See United States v. Starnes*, 583 F.3d 196, 216–17 (3d Cir. 2009).

As for the relocation enhancement of § 2B1.1(b)(10)(A), we now hold that clear error review is appropriate because "the legal issue decided by the district court is, in essence, a factual question." *Richards*, 674 F.3d at 220. Whether or not a scheme was relocated to another jurisdiction to evade law enforcement or regulatory officials is, at bottom, "a strictly factual test, such that once the test is stated[,] no legal reasoning is necessary to the resolution of the issue." *Id.* at 221 (internal quotation marks omitted) (quoting *United States v. Brown*, 631 F.3d 638, 644 (3d Cir. 2011)). Was the scheme relocated? Was it relocated to evade the authorities? These are fact-intensive questions that the district courts, given their "relative institutional advantages," are best equipped to answer. *Id.* We therefore review the District Court's application of the relocation enhancement for clear error.

By contrast, "[w]hether the government's conduct violate[d] the terms of [a] plea agreement is a question of law[,] and our review is plenary." *United States v. Moscahlaidis*, 868 F.2d 1357, 1360 (3d Cir. 1989).

III

Huynh makes three arguments on appeal. First, he claims the Government breached the plea agreement when it failed to oppose the relocation enhancement. Second, he argues the enhancement did not apply because Huynh's

7

travels did not constitute relocation of the scheme and were not intended to evade the authorities. Third, he contends the District Court erred in applying the organizer or leader enhancement because Huynh lacked the requisite "decision-making authority," the scheme involved fewer than five participants, and it was not "otherwise extensive," as required by USSG § 3B1.1(a). Huynh Br. 15–19. We will address each argument in turn.

A

When assessing whether a plea agreement has been breached, we first "identify the terms of the agreement and the government's alleged improper conduct," and next "determine whether the government has violated its obligations under that agreement." *United States v. Davenport*, 775 F.3d 605, 609 (3d Cir. 2015) (citing *United States v. Nolan-Cooper*, 155 F.3d 221, 235 (3d Cir. 1998)). "[I]f it has, we fashion the proper remedy." *Id.* The core question guiding the analysis is "whether the government's conduct [was] inconsistent with what was reasonably understood by the defendant when entering the plea of guilty." *Id.* (quoting *Nolan-Cooper*, 155 F.3d at 236). This is a "purely objective standard governed by the common law of contract." *Id.* (internal quotation marks and citation omitted). "[W]e look to the plain meaning of the plea agreement and . . . give the benefit of any doubt to the defendant, given the government's tremendous bargaining power in negotiating such plea agreements . . . and the fact that the defendant, by entering into the plea, surrenders a number of . . . constitutional rights." *Id.* (internal quotation marks and citations omitted). "[T]he Government must adhere strictly to the terms of the bargain[] it strikes," *United States v. Miller*, 565 F.2d 1273, 1274 (3d Cir. 1977), and "we

8

will hold the government to that bargain," *Davenport*, 775 F.3d at 609.

Huynh's argument that the Government breached the plea agreement centers on Paragraph 10. He contends that the Paragraph's stipulations to specific enhancements, coupled with its assignment of an offense level of 20, amounted to an exclusion of any other enhancements except for the organizer or leader enhancement, which the agreement acknowledged the Government would pursue. On Huynh's view, it wasn't enough for the Government to remain neutral; it had to affirmatively oppose the application of the relocation enhancement. Huynh insists the Government's "initial failure to object [to the PSR] . . . , its failure to take a position at sentencing, and its acquiescence to the district court's reasoning . . . should be construed as a clear breach of its agreement." Huynh Br. 12 n.5.

We disagree. As we explained in *Davenport*, "plea agreements 'must be interpreted as a whole[,] and no part should be ignored.'" 775 F.3d at 610 (quoting *United States v. Schwartz*, 511 F.3d 403, 405 (3d Cir. 2008)). And this agreement included many provisions that put Huynh on notice that the stipulations did not carve his offense level into stone. As in *Davenport*, the same paragraph that listed the parties' Guidelines stipulations also expressly reserved the Government's right to supply to the District Court "all information in its possession which it deems relevant to the application of the Sentencing Guidelines to the defendant's conduct." App. 73. Further underscoring the Government's discretion at sentencing, Paragraph 17 provided that the Government could "bring to the court's attention . . . all relevant information with respect to the defendant's background, character and conduct," and Paragraph 18

9

allowed the Government to respond "to any request by the court for briefing, argument or presentation of evidence regarding the application of Sentencing Guidelines to the defendant's conduct." App. 80. The parties also noted that their stipulations did not bind the District Court or the Probation Office. Read objectively and in their full context, the stipulations in Paragraph 10 did not restrict the Government as Huynh suggests. The plea agreement nowhere required the Government to object to the PSR's application of the relocation enhancement or to oppose it at sentencing.

Our decision in *Davenport* is instructive here. In that case, which involved a plea agreement similar to Huynh's, we concluded that there had been no breach despite the Government's affirmative pursuit of an enhancement that had been stricken from the parties' stipulations. 775 F.3d at 609–11. Here, Huynh concedes that the Government never affirmatively pursued the relocation enhancement, and the record shows that the Government maintained neutrality throughout the sentencing hearing. Contrary to Huynh's assertion, the Government did not "trigger[] the district court's inquiry," Reply Br. 6, into the enhancement's applicability. Instead, the District Court raised the issue *sua sponte*, noting Huynh's objection to the PSR and requesting argument on the issue. Only after the Court inquired did the Government make statements about the enhancement. And those statements were either factual or, to the extent they contained legal analysis, were consistent with Huynh's arguments.

In sum, the Government's responses cannot fairly be understood as an attempt to circumvent the plea agreement in order to advocate for the enhancement's application. *See United States v. Larkin*, 629 F.3d 177, 191 (3d Cir. 2010)

10

(concluding that no breach occurred where the government's statements on an omitted enhancement's applicability were limited to a "straightforward" presentation of legal issues and facts "well known to the District Court").[1] Accordingly, we hold that the Government did not breach the plea agreement.

B

We turn next to Huynh's arguments on the merits of the District Court's application of the relocation enhancement. The Guidelines provide that a base offense level may be increased by two levels if "the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials." USSG § 2B1.1(b)(10)(A). For the enhancement to apply, the defendant must have: (1) relocated a fraudulent

---

[1] Huynh cites *Nolan-Cooper* in support of his contention that the Government's statements improperly relied on the agreement's general authorization to comment on the application of the Guidelines "to defeat a specific provision." Huynh Br. 13. Huynh overlooks two critical elements of that case. First, the "specific provision" that we concluded had been breached expressly required that the government "not oppose" a particular sentencing position advanced by the defendant. *Nolan-Cooper*, 155 F.3d at 236. Second, the government in that case went beyond a neutral presentation of the relevant facts, effectively opposing the defendant's position. *Id.* at 237. Neither of those facts is present here.

11

scheme from one jurisdiction to another, and (2) done so to evade law enforcement or regulatory officials. *Id.*[2]

Huynh claims neither prong is satisfied. According to Huynh, the District Court mischaracterized the scheme's movements as relocation when in fact Huynh was "simply operating a fraudulent scheme in multiple jurisdictions." Reply Br. 5. Although multi-state schemes may involve cross-jurisdictional travel by their participants, Huynh argues that this is not the type of conduct the enhancement is intended to target. Instead, his scheme's various "out-of-town trips," all of which ended with Huynh returning home to California, reflected an "expansion of the conspiracy, not a relocation to avoid detection." Huynh Br. 10. Huynh also disputes that he meets the second prong, arguing that, in the absence of specific evidence that the scheme was relocated "for the purpose of eluding law enforcement," rather than for "economic reasons," the enhancement does not apply. Reply Br. 4–5. Each of these arguments merits analysis.

Critical to the District Court's determination that Huynh had relocated the scheme was its observation that the stores Huynh and his co-conspirators targeted generally were located far away from California and each other. The Court found it significant that the "vast majority" of the stores were

_____

[2] The Guidelines and commentary do not define the term "relocate" or provide any further guidance regarding this provision, *see* USSG § 2B1.1 cmt. n.1 ("Definitions"), n.9 ("Application of Subsection (b)(10)"). The dictionary defines "relocate" to mean "establish or lay out in a new place." Webster's Third New Int'l Dictionary, Unabridged (3d ed. 1993).

12

in the eastern half of the country despite no shortage of stores selling luxury watches in California or elsewhere on the West Coast. App. 22. The targets chosen thus did not reflect mere expansion, in the Court's view, but rather a deliberate effort to maximize the distance between the conspiracy's home base and the places where its members most likely would raise suspicions.

According to Huynh, these findings did not establish relocation because "operating in multiple jurisdictions was part of the larger conspiracy," citing *United States v. Hines-Flagg*, 789 F.3d 751 (7th Cir. 2015). Huynh Br. 10. The conspirators in *Hines-Flagg* made counterfeit identification documents in Detroit and used them at retail stores across several states to purchase merchandise on store credit accounts. *Id.* at 753. After each purchasing spree, the defendant and her nephew drove home to Detroit with the merchandise, which they either sold or kept for personal use. *Id.* at 754. The Seventh Circuit reversed, concluding that because it was "always meant to operate in multiple locations, with Detroit as its home base," the scheme was "not '*re*located' to Wisconsin, Ohio, and Illinois when [the defendant] traveled to those locations for temporary trips and returned to Detroit." *Id.*

Huynh's reliance on *Hines-Flagg* is misplaced for two reasons. First, whereas Huynh's targets were almost exclusively "half the country apart," App. 22, the scheme in *Hines-Flagg* was limited to four contiguous states. We agree with Huynh that "mere geographic distance . . . is not dispositive," Reply Br. 5, but the District Court did not clearly err in considering the geographic scope of the conspiracy and the dispersed nature of the locations to which the co-conspirators traveled when deciding whether to credit

13

Huynh's claim that the scheme's travels reflected only an expansion of its operations.[3] Second, the Seventh Circuit reviewed the application of the enhancement in *Hines-Flagg* de novo, *see* 789 F.3d at 754–56, whereas our review is far more deferential. Quite unlike de novo review, we may deem a district court's finding clearly erroneous only when we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 622 (1993)). Our review of the full record does not leave us with a conviction—much less a definite and firm one—that the District Court's determination that the scheme was relocated was mistaken.

Nor are we persuaded that the District Court clearly erred in finding that Huynh relocated the scheme for the purpose of evading the authorities. In support of his claim to the contrary, Huynh cites dicta in *Hines-Flagg* suggesting that

---

[3] For the same reasons, this case is also distinguishable from a panel decision of the Eleventh Circuit that Huynh cites, *United States v. Morris*, 153 F. App'x 556 (11th Cir. 2015). There, the court reversed a finding of relocation where the scheme's stolen credit cards and driver's licenses, all obtained in the greater Atlanta area, were used to make fraudulent purchases primarily in northern Georgia. *Id.* at 558–59. *Cf. United States v. Savarese*, 686 F.3d 1, 15–16 (1st Cir. 2012) (rejecting defendants' argument that despite trips throughout the country to withdraw fraudulent cash advances, their scheme was always firmly rooted in greater Boston and thus never relocated).

the "operation of a multi-jurisdictional scheme in order to reduce the chances of detection" is insufficient by itself to imply an intent to evade the authorities, 789 F.3d at 756. Even if we were to accept that premise, the record contains evidence—and the District Court made findings—supporting the conclusion that Huynh and his co-conspirators' efforts to evade the authorities consisted of more than simply the act of operating in multiple jurisdictions. Citing among other facts the conspirators' "driving to Nevada for purposes of flying out of Nevada to then go to the [E]ast [C]oast . . . , back sometimes to different airports," the District Court stated that it found "ample evidence that the intent was we'll go someplace other than where we are, where hopefully when we get our Rolex and we leave[,] we won't have any additional concerns or problem with law enforcement because we're not even around there, we don't live in the same half of the country." App. 21–22.

Further supporting the District Court's determination that the scheme was relocated to evade the authorities was Huynh's decision, with one exception, to target each store only once. *See Savarese*, 686 F.3d at 16 n.12. ("The evidence supports an inference that the defendants avoided returning to the same health clubs and gambling establishments not because of any shortage of available credit cards and funds, but because the likelihood of detection would otherwise have increased substantially.").

Finally, the evidence concerning Huynh's contacts with law enforcement and his actions thereafter support the inference that Huynh relocated the fraud scheme to evade law enforcement. Huynh was encountered by law enforcement on two separate occasions in two separate states; both incidents occurred during or shortly after Huynh and his co-

conspirators engaged or attempted to engage in fraudulent transactions and Huynh did not return to either state but engaged in fraudulent transactions in other states. These facts support the reasonable inference that the co-conspirators stopped engaging in fraud in the places where they were confronted by law enforcement and "relocated" their fraud scheme to several other states following such confrontations so as to evade law enforcement. *See United States v. Paredes*, 461 F.3d 1190, 1192 (10th Cir. 2006) (determining that the scheme relocated "to evade law enforcement" where fraudulently obtained goods "moved from Utah to Idaho because Utah became 'hot' after one of the [defendants] was arrested [there]"); *United States v. Smith*, 367 F.3d 737, 740 (8th Cir. 2004) (concluding that the evidence established that the defendant—who operated a fraud scheme in Iowa and then moved permanently to Florida and began operating a fraud scheme there—moved in order to evade law enforcement where he had been arrested several times for fraud and other crimes in Iowa and a warrant for his arrest was outstanding in Iowa).

The District Court did not clearly err when it found that Huynh relocated the scheme and that he did so for the purpose of evading the authorities.

C

We next address Huynh's argument that the District Court erred when it applied the organizer or leader enhancement. The Guidelines provide for a four-level increase in a base offense level if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a). The commentary to § 3B1.1 does not define

16

"organizer or leader" but lists factors for sentencing courts to consider in determining whether a defendant qualifies as such. Those factors include

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.* cmt. n.4. "We have explained that to be considered an organizer or leader, the defendant must have exercised some degree of control over others in the commission of the offense." *United States v. Helbling*, 209 F.3d 226, 243 (3d Cir. 2000) (internal quotation marks and citation omitted).

Huynh argues that he was not an organizer or leader of the conspiracy for two reasons. First, he was an equal partner with co-conspirator Phil Nguyen, who was indicted separately and did not receive an organizer or leader enhancement. Huynh cites our decision in *United States v. Katora*, 981 F.2d 1398 (3d Cir. 1992), for the proposition that the organizer or leader enhancement is inapplicable where "two participants . . . bear equal responsibility for the commission of crimes." Huynh Br. 18. This selective citation does not help Huynh. In *Katora*, we held that the enhancement could not apply to a scheme in which there were only two participants, both of whom were "equally culpable," because neither of them led the other and they had no additional

17

members to lead. 981 F.2d at 1405. Here, the conspiracy had additional members, so *Katora* is inapposite.[4]

Second, Huynh argues that he could not have been an organizer or leader of the scheme because he split its profits equally with his co-conspirators and did not exercise "any decision-making authority over the others . . . or control over assets." Huynh Br. 18. This argument is undermined by the overwhelming evidence in the record demonstrating Huynh's singular leadership role. It is not clear from the portion of the PSR Huynh cites that the profits were split equally among the co-conspirators, but even assuming he is correct on this score, it does not establish clear error by the District Court because the balance of the factors outlined in the commentary to § 3B1.1 unequivocally support its finding that Huynh was an organizer or leader of the scheme. Specifically, the record indicates that Huynh recruited Tung Thanh Doan, John Nguyen, and Phil Nguyen to participate in the scheme. Huynh arranged for their counterfeit licenses and fraudulent credit cards to be made and then instructed the men to memorize the details of their fake identities. Huynh also took possession of the watches and the credit cards and licenses used to obtain them, decided which stores would be targeted, coordinated

---

[4] Huynh's suggestion that the decision of Nguyen's sentencing court not to apply the enhancement somehow bound the District Court here to reach the same decision as to Huynh is without merit. Huynh also appears to suggest that two equally culpable individuals cannot both qualify as organizers or leaders. The commentary to USSG § 3B1.1 says otherwise. *See* § 3B1.1 cmt. n. 4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").

and paid for all travel, and controlled the scheme's finances from start to finish.[5] As the Probation Office noted in its response to Huynh's objection to the PSR, "[i]t does not appear that the codefendants had any independent decision making ability in connection with the scheme." PSR Addendum 3. Because Huynh exercised a significant "degree of control over others in the commission of the offense," *Helbling*, 209 F.3d at 243, we hold that the District Court did not clearly err when it found Huynh to be an organizer or leader of the scheme.

Huynh also challenges the application of the enhancement on the ground that the scheme involved fewer than five participants and was not "otherwise extensive." Under § 3B1.1, a participant is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." USSG § 3B1.1 cmt. n.1. Huynh does not dispute that at least three participants were involved (*i.e.*, Huynh and his two co-defendants), and although he does not

---

[5] Huynh cites several cases in which other courts of appeals reversed applications of an organizer or leader enhancement. *See United States v. Jordan*, 291 F.3d 1091 (9th Cir. 2002); *United States v. Parmelee*, 42 F.3d 387 (7th Cir. 1994); *United States v. Litchfield*, 959 F.2d 1514 (10th Cir. 1992). The reversal of the enhancements in those cases was predicated on a lack of evidence in the record that the defendants had exercised sufficient decision making authority. *See Jordan*, 291 F.3d at 1098; *Parmelee*, 42 F.3d at 395; *Litchfield*, 959 F.2d at 1523. Huynh's role in initiating the scheme, his authority over its operations, and his responsibility for coordinating its every move all distinguish his case.

explicitly accept Phil Nguyen's inclusion in the count, he effectively concedes the point by arguing that he and Nguyen were equal partners in the scheme. Huynh finds fault, however, with the District Court's inclusion in the scheme of two unnamed individuals: the car dealership employee who supplied Huynh with the stolen customer information and the woman who fenced the watches. Huynh posits that those two actors should not have been counted because they were neither "identified in some capacity in the conspiracy" nor "necessary to the scheme." Huynh Br. 16.

We need not reach the merits of these arguments, however, because we conclude that the District Court did not clearly err in finding that the scheme was otherwise extensive for purposes of § 3B1.1(a). In *Helbling*, we adopted a three-step approach to determining whether a scheme is otherwise extensive. First, a sentencing court must distinguish the scheme's "participants," as defined by the commentary to § 3B1.1, from non-participants who were nevertheless involved. 209 F.3d at 247–48. Next, the court must determine whether the defendant used each non-participant's services "with specific criminal intent." *Id.* at 248. Finally, the court must determine the extent to which those services were "peculiar and necessary to the criminal scheme." *Id.* Non-participants whom the defendant employed with specific criminal intent for services that were peculiar and necessary to the scheme may be counted as "functional equivalents" of participants. *Id.* If a scheme has a total of five or more participants and countable non-participants, it is "otherwise extensive." *Id.*

Although Huynh complains that the Court did not explicitly undertake this three-step analysis at his sentencing

20

hearing,[6] the Court's specific factual findings, viewed in light of the entire record, suffice for us to determine that its conclusion was not clearly erroneous. In this case, assuming only the four undisputed participants, the involved non-participants include the car dealership employee and the fence. Huynh does not dispute that he engaged both with the specific intent of furthering the aims of the conspiracy. And contrary to his suggestion, the record contains ample evidence that their services were necessary to the scheme's success. Without the stolen identification and credit information the car dealership employee supplied to Huynh, the scheme could not have created the fake identities necessary to complete its fraudulent credit applications and purchases. And by purchasing the stolen watches from Huynh, the fence supplied the cash necessary to cover the scheme's expenses and compensate its members. Huynh makes no attempt to show why these two individuals should not be counted as functional equivalents of participants, and we perceive no clear error in doing so. Because the sum of the scheme's participants and countable non-participants exceeds five, we conclude that the District Court did not clearly err in finding that the scheme was otherwise extensive within the meaning of § 3B1.1(a). Accordingly, the Court did not clearly err in finding that

---

[6] The District Court found that the scheme had at least five participants, rendering the "otherwise extensive" inquiry unnecessary. Its separate finding that the scheme was otherwise extensive was, as Huynh notes, not based on the *Helbling* factors outlined above. Coupled with the Court's factual findings regarding whom it deemed to be participants for purposes of § 3B1.1(a), however, the record provides us with a sufficient basis on which to evaluate the Court's finding for clear error.

21

Huynh was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG § 3B1.1(a).

## IV

Because the Government did not breach its plea agreement with Huynh and the District Court did not clearly err when it applied the relocation and organizer or leader enhancements, we will affirm the District Court's judgment of sentence.