**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-2199

UNITED STATES OF AMERICA,

v.

CHRISTOPHER MILLER,
                                            Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 3:23-cr-00095-001)
District Judge: Honorable Julia K. Munley

_____

Argued December 10, 2025

(Filed April 3, 2026)

Before: PHIPPS, ROTH, and RENDELL, *Circuit Judges*.

Christopher R. Opiel, Esq. [**ARGUED**]
OPIEL LAW
88 North Franklin Street
Wilkes-Barre, Pennsylvania 18701

*Counsel for Appellant*

Christian T. Haugsby [**ARGUED**]
Carlo D. Marchioli
OFFICE OF UNITED STATES ATTORNEY
MIDDLE DISTRICT OF PENNSYLVANIA
1501 N. 6th Street
Harrisburg, PA 17102
*Counsel for Appellees*

_____

OPINION OF THE COURT

_____

RENDELL, *Circuit Judge*.

Christopher Miller appeals his sentence for bank fraud, aggravated identity theft, and unlawful monetary transactions. He argues the District Court erred in concluding that Kelly Moran and Robert Reynolds—respectively, Miller's wife and neighbor—were "participants" and thus erred in applying the four-level enhancement under U.S.S.G. § 3B1.1(a) for organizing or leading "criminal activity that involved five or more participants or was otherwise extensive." In applying the enhancement, the District Court relied on the three-step inquiry we adopted in *United States v. Helbling* to conclude that the sum of the three participants and thirteen non-participants was the functional equivalent of five participants and thus satisfied the "otherwise extensive" prong. 209 F.3d 226 (3d Cir. 2000). *Helbling* relied on the Sentencing Guidelines' commentary in developing the three-step inquiry. Under our precedent, however, courts may consider commentary only when the text of a particular Guideline is genuinely ambiguous. *United States*

2

*v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021) (en banc). The District Court erred in not following this analysis, but as we explain below, the District Court would have reached the same conclusion if it had conducted the *Nasir* analysis before deferring to the commentary and *Helbling* test. Therefore, the legal error was harmless. *See generally* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). Accordingly, we will affirm Miller's sentence.

## I. BACKGROUND

Between April 2020 and September 2021, Miller defrauded over $2 million from the Paycheck Protection Program, the Economic Injury Disaster Loan program, and the Pandemic Unemployment Assistance program. Miller filed dozens of fraudulent loan applications on behalf of himself, his corporate entities, his wife, his neighbor, and at least thirteen other family members and associates. These family members and associates provided Miller with their personal information to fill out the applications, and upon receiving the fraudulent funds, they paid Miller kickbacks.

The District Court found that the role played by Miller's wife, Kelly Moran, and his neighbor, Robert Reynolds, exceeded the involvement of Miller's other family members and associates. Moran not only provided Miller with her personal information and received fraudulent funds, but she also called a lender to verify her personal information and check the status of an application. Further, after the FBI executed a search warrant on their home and issued a target letter, Moran willingly fled to South Carolina with Miller, where she lived with him for over a year while he used a fake

name. Also, many of those who were involved to a lesser degree were Moran's family members. Reynolds—in addition to supplying Miller with his personal information and paying Miller nearly $15,000 in kickbacks—sat in Miller's home to have his photo taken for use in a fraudulent loan application. He later pleaded guilty to wire fraud for his participation in Miller's scheme.

Fifty-four charges were brought against Miller for wire fraud, bank fraud, false loan applications, false statements to the Small Business Administration, aggravated identity theft, and unlawful monetary transactions. Miller accepted a plea deal and pleaded guilty to one count of bank fraud, one count of aggravated identity theft, and one count of unlawful monetary transactions. The final Presentence Investigation Report ("PSR") calculated Miller's criminal history score to be seven, placing him in criminal history category IV. The PSR calculated Miller's total adjusted offense level to be twenty-seven, which included the four-level leadership enhancement under U.S.S.G. § 3B1.1(a). Miller was also subject to a two-year consecutive mandatory sentence for the count of aggravated identity theft, yielding an advisory Guideline range of 124 to 149 months' imprisonment.

Miller objected to the PSR's calculations on two grounds. First, Miller objected to the application of the four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a). Specifically, Miller argued he was not the leader of "otherwise extensive" criminal conduct because Moran and Reynolds were not "participants" in Miller's scheme. Miller also objected to the PSR's calculation of his criminal history score. The District Court overruled both of Miller's objections,

4

adopted the PSR's findings, and sentenced Miller to 149 months' imprisonment.

Miller appealed, challenging only whether the District Court erred in applying the four-level leadership enhancement pursuant to U.S.S.G. § 3B1.1(a) by incorrectly categorizing Moran and Reynolds as "participants" in Miller's scheme.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

We review the District Court's interpretation of the Sentencing Guidelines de novo. *United States v. McIntosh*, 124 F.4th 199, 205 (3d Cir. 2024). We review the District Court's factual findings in support of the enhancement under the clear error standard. *See United States v. Adair*, 38 F.4th 341, 347 (3d Cir. 2022) (citing *United States v. Huynh*, 884 F.3d 160, 165 (3d Cir. 2018)).

## III. DISCUSSION

For many years, we treated the Sentencing Commission's commentary as authoritative and gave it controlling weight unless it was "inconsistent with, or a plainly erroneous reading of, that [G]uideline." *United States v. Metro*, 882 F.3d 431, 437 (3d Cir. 2018) (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)). However, in *Kisor v. Wilkie*, 588 U.S. 558, 573 (2019), the Supreme Court held that courts should defer to agency interpretations of their own regulations only where the regulation is genuinely ambiguous. Thereafter

5

we applied that holding in *United States v. Nasir*, 17 F.4th 459, 471 (3d Cir. 2021), and announced a three-step test to decide whether to consult and defer to a particular provision of the Sentencing Guidelines commentary. First, we ask whether the Guideline is "genuinely ambiguous" after "carefully consider[ing] the text, structure, history, and purpose." *Id.* (quoting *Kisor*, 588 U.S. at 575 (internal quotation marks omitted)). If it is not, our inquiry ends, and we apply the plain text of the Guideline. *Id.* If it is genuinely ambiguous, we proceed to step two and ask if the commentary is "reasonable," *id.*, meaning the commentary "clarif[ies] the ambiguity" identified in step one without "chang[ing] the meaning of the text," *United States v. Chandler*, 104 F.4th 445, 450 (3d Cir. 2024), or said differently, that the commentary is within "the outer bounds of permissible interpretation." *Nasir*, 17 F.4th at 471 (quoting *Kisor*, 588 U.S. at 576). If the commentary is reasonable, we proceed to step three and consider "whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* (quoting *Kisor*, 588 U.S. at 576). If the commentary's interpretation "implicate[s] [the Commission's] substantive expertise[,]" "reflect[s] fair and considered judgment," and is the agency's "official position," it is entitled to controlling weight, and we will defer to it. *Id.* (quoting *Kisor*, 588 U.S. at 577, 579).

Miller challenges the District Court's application of Guideline § 3B1.1(a), which permits a four-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Miller does not challenge the District Court's ruling that he was an organizer or leader, so our inquiry focuses on whether "otherwise

6

extensive" is genuinely ambiguous.[1] Before *Kisor* and *Nasir*, we had interpreted the "otherwise extensive" prong of Guideline § 3B1.1(a) at issue here. *See United States v. Helbling*, 209 F.3d 226 (3d Cir. 2000). In *Helbling*, we deferred to the Commission's interpretative commentary in defining "participant" and "otherwise extensive" when establishing the test to determine what qualifies as "otherwise extensive." *Id.* at 244–45 (citing U.S.S.G. § 3B1.1, Application Note 1 (defining "participant"), U.S.S.G. § 3B1.1, Application Note 3 (stating that "all persons involved during the course of the entire offense are to be considered" when determining whether the activity was "otherwise extensive")). Because in *Helbling* we deferred to the commentary without considering whether "otherwise extensive" was ambiguous, after *Kisor* and *Nasir*, we must reverse course and consider whether that phrase is "genuinely ambiguous."

### A. *The Guideline is Genuinely Ambiguous*

For step one, we must apply the standard tools of statutory interpretation, which include the dictionary definitions of words and phrases that are contemporaneous with the promulgation of the Guideline. *See Chandler*, 104 F.4th at 451. To begin, we note Miller's argument that this Court already found this provision as unambiguous in *Adair* is incorrect. Rather, *Adair* dealt with the "organizer or leader" prong of Guideline § 3B1.1(a), and its conclusion that "organizer" and "leader" are not genuinely ambiguous does not control whether "otherwise extensive" is genuinely ambiguous. 38 F.4th at 354.

---

[1] There is no contention that there were five or more participants.

Turning to dictionaries in use at the time of the Guideline's promulgation, Black's Law Dictionary defines "otherwise" to mean "[i]n a different manner; in another way, or in other ways." *Otherwise*, Black's Law Dictionary (6th ed. 1990); *see also Otherwise*, Black's Law Dictionary (5th ed. 1979). Black's Law Dictionary defines "extensive" to mean "[w]idely extended in space, time, or scope; great or wide or capable of being extended." *Extensive*, Black's Law Dictionary (6th ed. 1990); *see also Extensive*, Black's Law Dictionary (5th ed. 1979). These dictionary definitions do not resolve what Guideline § 3B1.1(a) means by "otherwise extensive."

The standard tools of statutory interpretation also include an analysis of other textual aspects. *See, e.g.*, *Adair*, 38 F.4th at 351 ("Other textual aspects of [U.S.S.G.] § 3B1.1(a) illuminate the meaning of 'organizer' and 'leader.'"). Here, "otherwise extensive"—like "involved five or more participants"—modifies "criminal activity." These modifying phrases are joined by the conjunction "or," "which most commonly functions to indicate either an alternative between different or unlike things, states, or actions or a choice between alternative things, states, or courses." *Id.* (footnotes omitted). But "or" can also have a different meaning—it can indicate "the synonymous, equivalent, or substitutive character of two words or phrases," or even a "correction or greater exactness of phrasing or meaning." *Id.* at 351–52 (internal quotations and citations omitted); *see Honig v. Doe*, 484 U.S. 305, 334 (1988) (Scalia, J., dissenting) (identifying the multiple common definitions of the term "or"). Accordingly, to understand "otherwise extensive" requires an understanding of the comparator—here, "five or more participants."

Miller argues if the "otherwise extensive" prong could be satisfied by leadership over "a handful of participants, the five (5) participant threshold set out at the beginning of the [G]uideline[] would lose meaning." Miller Supp. Br. at 7. But we draw the opposite conclusion. To read "otherwise extensive" as requiring the exact thing as the initial "five or more participants" prong would render the phrase entirely superfluous. *See Honig*, 484 U.S. at 334 ("That is rather like a statute giving the vote to persons who are '18 or 21.'"); *see also Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 210 (3d Cir. 2008) (the Court must presume that "every word in a statute has meaning and avoid interpreting one part of a statute in a manner that renders another part superfluous") (citing *Rosenberg v. XM Ventures*, 274 F.3d 137, 141–42 (3d Cir. 2008)). However, neither the dictionary definitions nor our standard tools of statutory interpretation clarify whether "otherwise extensive" is restricted to the number of individuals involved in the criminal activity or may include other indicia of a criminal activity's extensiveness such as the magnitude of the harm, the complexity of the planning, or the number of victims.

The dictionary definitions of "participant" do not clarify the ambiguity either. Merriam-Webster defines "participant" as "one that participates," and to "participate" as "to possess something of the nature of a person, thing, or quality," "to take part," or "to have a part or share in something." *Participant*, Merriam-Webster's Collegiate Dictionary (9th ed. 1983); *Participate*, Merriam-Webster's Collegiate Dictionary (9th ed. 1983). For instance, the meaning of "participant" can be completely changed by the use of the modifier "willing" or "unwitting," suggesting that "participant" is genuinely ambiguous as well. *See, e.g.*, *United States v. Barbosa*, 271

9

F.3d 438, 470 (3d Cir. 2001) (record showed that appellant was "apparently a *willing participant* in the operation to smuggle drugs to Philadelphia from Aruba" as opposed to the "classic example of a courier . . . who was enticed, coerced, or exploited by an affluent, sophisticated drug dealer") (emphasis added); *United States v. Flores Perez*, 849 F.2d 1, 2 (1st Cir. 1988) (appellant argued the evidence was insufficient to prove "he was anything more than an *unwitting participant* who was caught in the wrong place at the wrong time") (emphasis added).

The Commission identified the purpose for the enhancement in the background commentary for Guideline § 3B1.1, which we may consider without going through the *Kisor* process,[2] as follows:

> This section provides a range of adjustments to increase the offense level based upon the *size of the criminal organization (i.e., the number of participants in the offense)* and the degree to which the defendant was responsible for committing the offense . . . . The Commission's intent is that this adjustment should increase with both *the size of the organization* and the degree of the defendant's responsibility.

---

[2] *See Adair*, 38 F.4th at 347–48 ("The paradigm applies only to the Commission's interpretive commentary, not its commentary related to either background information or circumstances that may warrant a departure from a [G]uideline.").

U.S.S.G. § 3B1.1, Background (emphasis added). The background commentary also explains why the size of the criminal activity is important to the purpose of the provision, noting that the Sentencing Commission drafted the Guideline's separate provisions to respond to criminal organizations whose size and structure increases the significance of the defendant's role. *Compare* U.S.S.G. § 3B1.1(a)–(b), *with* § 3B1.1(c).

Our precedent also supports a finding of ambiguity. In *Helbling*, we recognized that although "otherwise extensive" appeared to be a "seemingly simple phrase," it had "spawned much discussion, and some disagreement, in the opinions of several courts of appeals." *Helbling*, 209 F.3d at 244. Whereas the Second Circuit—whose test we adopted in *Helbling*—limited the focus to the headcount of individuals involved, other circuits permit a broader consideration of other indicia of extensiveness including the breadth, scope, complexity, geographical reach, and duration of the scheme. *Id.* (citing *United States v. Carrozzella*, 105 F.3d 796, 802–03 (2d Cir. 1997); *United States v. Dietz*, 950 F.2d 50, 53–54 (1st Cir. 1991)). This circuit split further supports a finding of ambiguity.

Moreover, two former Justices referred to the provision as an example of a "highly complex or open-ended Sentencing Guidelines [provision]" that was "obviously written for application by an experienced trial judge," highlighting the phrase "otherwise extensive." *Blakely v. Washington*, 542 U.S. 296, 346–47 (2004) (Breyer, J., dissenting, joined by O'Connor, J.).

The history of Guideline § 3B1.1 does little to clarify the meaning of "otherwise extensive." The Commission has

only made one non-substantive amendment to § 3B1.1 since promulgating the Guideline in 1987. *See* U.S.S.G. App. C Amend. 831 (Nov. 1, 2024) (inserting the word "subsection" in § 3B1.1(c)). Accordingly, the history of § 3B1.1 also supports a finding of ambiguity.

In sum, the text of § 3B1.1 is ambiguous, and the purpose, history, and precedent relating to the Guideline only confirm that ambiguity.

### B. Reasonableness of the Commentary

For commentary to be reasonable, it must not "improperly expand[ ] the Guideline," *United States v. Banks*, 55 F.4th 246, 253 (3d Cir. 2022), and must remain within "the outer bounds of permissible interpretation," *Nasir*, 17 F.4th at 471 (citation omitted). The commentary here does exactly that. The commentary directs the court to consider "all persons involved during the course of the entire offense" when assessing whether an organization is "otherwise extensive." U.S.S.G. § 3B1.1, Application Note 3. It states that "a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." *Id.* This does not expand the Guideline but rather narrows the focus of the inquiry upon the number and roles of the individuals knowingly, and unknowingly, involved. *Cf. Banks*, 55 F.4th at 258 (declining to defer to the commentary when it expands the definition). Other circuits interpret "otherwise extensive" to allow sentencing courts to consider other factors like geographic scope, the reach of the criminal activity, drug weight, and economic loss. *See United States v. Figueroa*, 682 F.3d 694, 695–96 (7th Cir. 2012); *United States v. Dietz*, 950 F.2d 50, 53 (1st Cir. 1991) (affirming district court's finding

12

that the defendant's criminal activities were "sufficiently panoramic" to justify the increase); *United States v. Vasquez-Rubio*, 296 F.3d 726, 729 n.3 (8th Cir. 2002) (finding "the nature and complexity of the operation and its geographical reach" are also factors that can support a finding that criminal activity was "otherwise extensive"). By comparison, the commentary offers a narrower inquiry focused on the headcount of individuals involved. Accordingly, the commentary's direction of what to consider can hardly be said to expand the text.

The commentary's definition of "participant" also falls within the outer bounds of permissible interpretation. The commentary defines "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, Application Note 1. This definition narrows "participant" from its dictionary definition and thus is reasonable.

## C. Entitlement to Controlling Weight

As the last step of the *Nasir* process, we consider "whether the character and context of the agency interpretation entitles it to controlling weight," *Nasir*, 17 F.4th at 471, since "[s]ome interpretative issues may fall more naturally into a judge's bailiwick." *Kisor*, 588 U.S. at 578. As guideposts, the Supreme Court in *Kisor* identified three character-and-context circumstances in which an agency's otherwise reasonable interpretation should not receive controlling weight. *See id.* at 576–79. Those occur when an agency's interpretation is not its "'authoritative' or 'official position,'" *id.* at 577, when the agency's interpretation does not implicate its "substantive expertise" in some way, *id.*, and when the agency's reading

does not reflect its "fair and considered judgment" but rather is a "convenient litigating position," or a "*post hoc* rationalization," *id.* at 579.

The commentary here is entitled to controlling weight. The Application Notes are the Commission's official position rather than an ad hoc pronouncement. *See United States v. Caraballo*, 88 F.4th 239, 248 (3d Cir. 2023) ("First, the Commentary's definition is the Sentencing Commission's official position and not merely an ad hoc pronouncement."). Further, the commentary implicates the Commission's substantive expertise. One of the three principal purposes of the Sentencing Commission is to "establish sentencing policies and practices for the federal courts, including [G]uidelines to be consulted regarding the appropriate form and severity of punishment for offenders convicted of federal crimes[.]" *About*, United States Sentencing Commission, https://perma.cc/Y7YE-DEJR (last visited Dec. 11, 2025). The Sentencing Guidelines are "core to the [Sentencing Commission's] mission" and "provide federal judges with fair and consistent sentencing ranges to consult at sentencing," in part by "providing certainty and fairness in meeting the purposes of sentencing by avoiding unwarranted disparity among offenders with similar characteristics convicted of similar criminal conduct, while permitting sufficient judicial flexibility to consider relevant aggravating and mitigating factors." *U.S. Sentencing Commission's 2024 Annual Report*, United States Sentencing Commission, https://perma.cc/7D4U-XUBF (last visited Dec. 11, 2025). The question of what impact the size of a defendant's criminal organization, or criminal activity that she led, should have on a sentence is "squarely within the Sentencing Commission's bailiwick." *United States v.*

*Mercado*, 81 F.4th 352, 360 (3d Cir. 2023) (internal quotations and citation omitted). And finally, the commentary was not instituted for any post hoc purpose but has been included since 1987, and thus reflects the Sentencing Commission's "fair and considered judgment." *Kisor*, 588 U.S. at 579.

Accordingly, the commentary's Application Notes regarding "otherwise extensive" and "participant" are entitled to deference.

### D. *The Continuation of the* Helbling *Test*

Now permitted to defer to the commentary after completing the *Kisor* analysis, we briefly consider whether the way in which we analyzed the commentary in *Helbling* remains the appropriate test for "otherwise extensive." In *Helbling*, we presciently noted the lack of clarity of the "otherwise extensive" phrase and determined the meaning of the commentary.[3] In holding that "otherwise extensive" required a headcount of the individuals involved, the Court concluded that the "focus upon the number and roles of the individuals knowingly, and unknowingly, involved best comports with the text of § 3B1.1(a), its application notes and commentary, as well as the overall structure of the Sentencing

---

[3] In *Adair*, we identified *Helbling* as one of the pre-*Kisor* decisions that had misinterpreted the "organizer or leader" enhancement by deferring to the commentary instead of engaging in the *Kisor* process. *Adair*, 38 F.4th at 350 n.4, n.5. But that finding was limited to the interpretation of the words "organizer" or "leader," which was a separate analysis in *Helbling*. *See Helbling*, 209 F.3d at 243 (deferring to the Application Note without engaging in any textual analysis).

15

Guidelines." *Helbling*, 209 F.3d at 245. We relied on the commentary, which indicated that the "otherwise extensive" inquiry should focus on the number of individuals involved. *Id.* at 246. Moreover, constraining the "extensiveness" inquiry to a head counting analysis "reduces the potential for double counting certain aspects of criminal activity that are considered elsewhere in the scheme of the [G]uidelines, thus helping to maintain the distinct character of various [G]uideline sections." *Id.* For instance, Miller received a separate sixteen-level enhancement due to the amount of intended loss and a two-level enhancement because the offense involved sophisticated means. U.S.S.G. §§ 2B1.1(b)(1)(I), 2B1.1(b)(10)(C).

The Court acknowledged that "[a]lthough Application Note 3 supports our mode of analysis, the [G]uidelines are silent as to how the sentencing court actually is to decide which non-participants should be considered, and what combination of participants and countable non-participants is the 'equivalent' of five participants." *Id.* at 247. *Helbling* thus adopted the Second Circuit's three-step inquiry. First, the sentencing court separates out the "participants," as defined by Application Note 1, from non-participants who were involved in the criminal activity. The defendant may be considered as one of the participants. *Id.* at 248. Next, the court determines whether the defendant used each non-participants' services with specific criminal intent. Third, the court determines "the extent to which the services of each individual, non-participant, were peculiar and necessary to the criminal scheme." *Id.* After concluding which individuals may be counted, the court "must then consider whether the sum of the participants and countable non-participants is the functional equivalent of five participants." *Id.*

Deferring to the commentary, we again subscribe to this three-step inquiry to determine whether the sum of participants and countable non-participants is the functional equivalent of five participants. As explained in *Helbling*, the three-step test is supported by the text, the structure, and the purpose of the Guideline and the commentary. A broader interpretation is not supported by the commentary and risks double counting certain aspects of criminal activity that are considered elsewhere in the scheme of the Sentencing Guidelines.

### E. The District Court Did Not Commit Clear Error

On appeal, Miller challenges only the District Court's classification of Kelly Moran and Robert Reynolds as "participants" in the *Helbling* analysis. Applying the post-*Nasir* understanding of § 3B1.1(a) and deferring to the commentary and *Helbling* analysis to the District Court's factual findings, which are not clearly erroneous, reveals that Miller qualified for the leadership enhancement. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (explaining that clear error requires a "definite and firm conviction that a mistake has been committed." (citation omitted)).

The District Court determined that there were three participants: Miller, Reynolds, and Moran. The Court found that Reynolds was an "integral part of the scheme" and "pled guilty to his participation in the scheme." App. 230. Miller urges that Reynolds is indistinguishable from the other thirteen non-participants who provided Miller with their personal information and transferred kickbacks to Miller. But as the District Court explained, Reynolds pleaded guilty to wire fraud

17

for the conduct he undertook jointly with Miller. The District Court did not err in characterizing Reynolds as a participant.

The Court also considered Moran's conduct. She called a lender, applications were filed on behalf of her family members, she personally received monetary benefits from the scheme, and she fled Pennsylvania with Miller after he received a target letter and lived with Miller out of state while he used a fake name for a year. Miller argues that Moran was not a participant because there is no evidence that she drafted or submitted any fraudulent loan applications herself and characterizes Moran's call to the PPP lender as "an act of curiosity or follow-up." Opening Br. at 14. In attempting to analogize Moran to non-participants in *Helbling*, Miller would have us draw parallels between actors in different factual settings, essentially between apples and oranges. The comparison of an individual's factual involvement in one case to another individual's factual involvement in another case is difficult at best. Each instance must rise and fall on its own facts.[4] Here, the District Court did not clearly err in concluding that Moran was criminally culpable for her role in Miller's scheme. Moran personally called a lender to check the status of the fraudulent loan application, and she fled with Miller after he received a target letter. Moreover, several of the individuals for whom Miller filed fraudulent applications were Moran's family members. These facts support the District Court's conclusion that Moran was a participant in Miller's criminal

---

[4]  Moreover, Helbling contested the district court's determination that six people were countable non-participants. *Helbling*, 209 F.3d at 248. Here, Miller challenges the District Court's determination that two people are participants—a different issue.

18

activity, and thus, the District Court did not clearly err in categorizing her as a participant.

Next, the District Court found Miller used the participants and non-participants' services with specific criminal intent. The thirteen non-participants, Reynolds, and Moran supplied the information but for which Miller could not have committed the crime. The District Court also determined the services of the non-participants were peculiar and necessary to the criminal scheme, because Miller used the non-participants' information to complete the fraudulent applications. Finally, the District Court concluded the three participants plus the non-participants met the functional equivalent of five participants and overruled Miller's objection to the enhancement. The District Court did not clearly err in so finding.

## IV. CONCLUSION

In light of the above, we will affirm the District Court's judgment of sentence.